**Opinion issued January 17, 2013**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-00989-CR

———————————

**BRENDA FAY NELSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 180th District Court**
**Harris County, Texas**
**Trial Court Case No. 1239421**

---

## O P I N I O N

A jury found appellant, Brenda Fay Nelson, guilty of the offense of murder,[1]

and the trial court assessed her punishment at confinement for 40 years. In five

---

[1]    *See* TEX. PENAL CODE ANN. § 19.02 (Vernon 2011).

issues, appellant contends that the evidence is insufficient to support her conviction, either as the primary actor or as a party to the murder, and the trial court erred in submitting an instruction to the jury on law of parties, denying her motion to suppress her statement, and admitting hearsay evidence.

We affirm.

## Background

William Leon Clark testified that between 9:45 and 10:00 on the night of September 12, 2009, he saw a white pickup truck parked between the middle and side of Mary Kay Lane in a rural, wooded area of Houston. The next morning, Clark drove down Mary Kay Lane, saw the same truck parked in the same spot on the street, and alerted the Houston Police Department ("HPD") to the suspicious truck.

HPD Officer D. Valentine testified that he was dispatched to the 14000 block of Mary Kay Lane to investigate the suspicious truck. Upon his arrival, Valentine saw the complainant, Perry Barefield, slumped over, deceased, and buckled into the passenger seat of the truck. Valentine noted that blood was coming out of the complainant's ear, and he had a wound on his shoulder. It appeared that the complainant, who was not wearing shoes or socks and was wearing somewhat dirty clothes, had been shot in the same position in which he was found, possibly in his sleep. Valentine found in the truck the complainant's

2

personal property, including his ring, wallet, and cellular telephone. He noted that the truck keys were in the ignition. And although Valentine did not find a weapon inside the truck, he found two spent .380 caliber shell casings outside the truck near the driver's door and the rear bumper.

HPD Officer M. Dillingham, who was also dispatched to the scene, testified that he saw the complainant leaning toward the driver's side of the truck in a slumped position. Dillingham concluded that the complainant had been murdered around 9:55 p.m. on September 12, 2009 because Clark saw the truck that night and the officers discovered the body the next morning.

Later on September 13, 2009 at 11:30 a.m., Dillingham telephoned appellant, the complainant's wife, who was, at that time, at a police station filling out a missing person's report. Dillingham informed appellant that the complainant had been "found deceased," but he did not give her any additional details. He explained that he did not inform appellant of the street or area of town in which the complainant was found, the location of the wounds on the complainant's body, or his opinion about the time of death. These details were also not released to the public at that time.

On the morning of September 14, 2009, Dillingham went to appellant's home where she agreed to give him a statement and asked her brother to accompany her to the police station. In her first recorded interview with Officer

3

Dillingham, appellant gave him her address and cellular telephone number. Although she initially stated that she and the complainant were on good terms, appellant later said that they were not on good terms because of his infidelity. Appellant explained that the night before the complainant's body was found, the two of them had eaten dinner and watched a movie before the complainant fell asleep. The complainant awoke at 8:00 p.m. and left the house to buy a Black & Mild cigarette. When he didn't return home, appellant said that she started calling his cellular telephone at 8:30 p.m. Appellant then gave Dillingham contact information for others who might have more information about the murder.

On September 15, 2009, appellant gave her second and third recorded interviews to Officer Dillingham. Dillingham explained to appellant that he wanted to clear up "[a] bunch of inconsistencies" between her first statement and the accounts given by other witnesses. Appellant then told Dillingham that on September 13, 2009, she had taken her sister-in-law, Sandra Bennett, to work-related appointments and then to her home at around 3:45 or 4:00 p.m. Appellant then went to the home of Dorothy Miller and her son, Jason, and stayed there until 5:00 p.m., after which she went home and drove around with the complainant and their dogs. Appellant explained to Dillingham that she did not mention in her first statement that she went to the Millers' home because it was something that she did regularly and did not think it important. She also explained that Jason was her ex-

4

boyfriend and long-time friend to whom she had gone for comfort in the past while she was separated from the complainant. Appellant admitted to having had an affair with Jason during her marriage to the complainant, but she had not had a relationship with Jason since January 2009, when she had moved back in with the complainant. She stated that Jason was not at home on September 13, 2009, when she went to see his mother, she did not see him that day or talk to him by telephone, and he was wrong if he said otherwise. Appellant noted that when the complainant did not come home that night by 8:30 p.m., she began calling his cellular telephone. She also stated that when he did not answer, she left home, went looking for him, and drove to a friend's apartment in the "Astrodome" area. Appellant noted that she returned home at around 9:00 p.m., went to bed, and did not wake until 3:00 a.m. the next morning. And she explained to Dillingham that she had simply forgotten to tell him about her search for the complainant on the night he was murdered.

On November 2, 2009, appellant gave her fourth and final interview to Officer Dillingham. She again stated that she had gone to Dorothy Miller's home on the afternoon of September 12, 2009, did not see Jason, and left at around 5:00 p.m., getting home around 5:20–5:30 p.m. Appellant also stated that when the complainant did not come home later that evening, she went looking for him at two nearby stores and then drove to the Astrodome area to her friend's apartment, but

her friend was not home. Appellant then returned home around 9:30 p.m. She noted that on the night of the murder she was not in the vicinity of Mary Kay Lane, nor in the Bellfort area of Houston, and she could not explain why her cellular telephone records would show otherwise. Appellant denied having told anyone the manner in which the complainant had been killed or the location of the gunshot wounds on his body. She also stated that the complainant was not telling the truth when he told his niece and nephew that she had said that she was going to "take him out." Appellant left the police station at the end of the interview, but police officers arrested her later that same day.

After the trial court admitted into evidence appellant's cellular telephone records, HPD Officer J. Taylor testified that the records show (1) subscriber information; (2) dates, times, and lengths of communications; (3) identifying information about the handsets used; (4) the telephone numbers that communicated with the handset; (5) the cellular antennas or towers that processed the calls; and (6) the exact latitude and longitude of the tower or antenna that processed each call.

Officer Taylor noted that he also obtained additional information about four telephone numbers that appeared on appellant's cellular telephone records on September 12, 2009. The first number "713-734-4410" was assigned to a pay telephone at a Chevron gas station located at 13306 Cullen in close proximity to

the crime scene. The second number "713-657-9474," a Cricket cellular telephone number, was registered to "Marquis Sykes." The third number "713-514-4275," a Sprint cellular telephone number, was registered to "David Burnes." And the fourth number "713-734-8454," a landline telephone number, was assigned to the Miller home located at 5635 Canterway, in close proximity to the crime scene.

Officer Taylor explained that appellant's cellular telephone records show that between 9:37 and 9:58 p.m. on September 12, 2009, her cellular telephone was located in a narrow service area which is processed by "Westpark Tower 305" and includes the crime scene. While appellant's cellular telephone was in that area, several telephone calls were made from and received by it. At 9:37 p.m., appellant's cellular telephone received a call from the pay telephone at the Chevron gas station, and calls were placed to that telephone from her cellular telephone at 9:42 and 9:46 p.m. At 9:49 p.m., a call was placed from appellant's cellular telephone to the Cricket cellular telephone registered to Marquis Sykes, and her cellular telephone received calls back from that telephone at 9:49, 9:50, and 9:58 p.m.

Officer Taylor noted that the telephone numbers for the Chevron pay phone and Marquis Sykes' telephone appear on appellant's cell phone records only on the date of September 12, 2009. The telephone number for the Millers' home, which is near the crime scene, accounts for over one hundred outbound and forty inbound

7

calls that appear in appellant's cellular telephone records, including calls made or received within an hour before and an hour after the time period in which the complainant was killed.

Appellant's telephone records also revealed that appellant did not start calling the telephone number "713-248-6113," which was registered to the complainant's cellular telephone, until 10:56 p.m. Appellant's first call to the complainant was processed by "Cicero Tower 296" from a location that was not her home address. And the only call made from appellant's cellular telephone to the complainant's cellular telephone before 10:56 p.m. that day was made at 2:58 p.m. The next call from appellant's cellular telephone to the complainant's cell phone was made at 11:12 p.m., and it was processed by the "Westpark Tower 164," closer to her home. A final call was made from appellant's cellular telephone to the complainant's cellular telephone at 11:31 p.m., and it was processed by the same tower.

Officer Taylor was able to determine the location of appellant's cellular telephone at particular times from her cellular telephone records, and he created a map showing the location and movement of her cellular telephone. Taylor made a PowerPoint presentation to the jury, noting the tower locations, the crime scene, and the Chevron gas station. Taylor opined that the name "Marquis Sykes" could

8

have been used as an alias because Cricket does not require purchasers to provide identification.

Harris County assistant medical examiner Mary L. Anzalone testified that on September 14, 2009, she supervised and observed an autopsy of the complainant's body. Based on the autopsy, Anzalone opined that the complainant died from two gunshot wounds, one to his head and one to his left shoulder. The wounds were consistent with the complainant being shot while in the same position as he was found. The trial court admitted into evidence the autopsy report and bullets found in the complainant's body.

Cynthia Parker, the complainant's niece, testified that she spent the Labor Day weekend before the complainant was killed with appellant and the complainant. Parker and her husband talked to appellant and the complainant about problems in their marriage and the fact that appellant and the complainant were going to separate. Parker noted that it was common for appellant and the complainant to fight, their marriage was "rocky" and "tumultuous," appellant had moved out at least four times, and neither had been faithful. And appellant told Parker that she was back in a relationship with Jason, with whom she had had an intimate relationship when she had previously separated from the complainant.

Parker explained that appellant called her around noon on September 13, 2009 to explain that the complainant had been found dead. From her home in

Austin, Texas, Parker drove immediately to appellant's home, where Parker found appellant to be calm and not crying. Appellant told Parker that she and the complainant had dinner and watched television before he fell asleep. When appellant woke the complainant, he left their home at 9:00 p.m. to get a Black & Mild cigar. When he did not come home, she started calling him after 30 to 40 minutes, and continued to call him until she fell asleep at 10:00 p.m. Appellant noted that she awoke at 3:00 a.m. and again tried to call the complainant. When Parker asked if she had tried to look for the complainant, appellant said that there were too many places to look and she would not have known where to find him. It was not until several weeks later that appellant told Parker that she had gone to look for the complainant the night that he was killed. And she thought it would "look strange" if she admitted that she had left the house to look for the complainant that night. Parker also noted that appellant told her that before they had dinner, she and the complainant had been driving around in their car with their dogs. And appellant told Parker that they were two months behind on their mortgage and they could not catch up.

Parker further testified that on the day after the complainant had been murdered, she and appellant drove to the crime scene. Although appellant asked Parker to obtain directions, appellant seemed to know how to get to the crime

10

scene. Parker explained that she had learned the address of the crime scene watching the television news and looked up the location on her iPhone.[2]

Sharina Glover, appellant's neighbor, testified that appellant called her around noon on September 13, 2009 to tell her that the complainant was dead. Glover and her husband then went to appellant's home, where appellant explained that the night before, she and the complainant had eaten and watched a movie, he fell asleep, and then he woke and left to buy cigarettes. Appellant noted that she started calling the complainant around 8:30 to 9:00 p.m. when he did not return, but he did not answer his cellular telephone. Appellant also noted that she had tried calling Edward Bennett, the complainant's brother, to see if he had heard from the complainant and, the next morning, she went to a police station to file a report. Appellant, who seemed sad and cried a little, told Glover that the complainant had been shot in the head. Glover and her husband went home after appellant's daughter and her boyfriend arrived.

Glover, concerned for appellant, soon returned to her home, where other family members had gathered. Appellant told them that she did not know where on his body the complainant had been shot. Glover thought this was "interesting" because appellant had told her earlier that the complainant had been shot in the

---

[2] Officer Dillingham testified that he issued a press release on September 13, 2009, noting that a body had been found in the 14000 block of Mary Kay Lane. However, he did not know whether the media would have gotten the press release the day that it was issued.

11

head.  Glover again went home, but returned later to appellant's home to find out what had happened when the family members went to the crime scene.  Glover noted that at this time, appellant told those present that the complainant had been shot in the shoulder.  Glover then went home and spoke with her husband about the three different statements that appellant had made about where the complainant had been shot.  Glover noted that appellant had previously told her that she and the complainant had been arguing and not getting along, they were going to separate, and she would let the house go into foreclosure.  Glover also noted that she saw appellant and the complainant outside their house the Friday before he was killed, and they appeared to be arguing.

Gayle Richardson, a mortician who directed the complainant's funeral, testified that appellant had supplied her information to put in the complainant's funeral program.  Appellant stated that the date of death was September 12, 2009 even though the date of death listed on the complainant's death certificate was September 13, 2009.  And appellant insisted that Richardson use the date that she provided, September 12, 2009, rather than the date shown on the death certificate.

Edward Bennett, the complainant's brother, testified that several weeks before he was killed, the complainant told him that appellant had threatened him and said "[t]hat she would have him did away with."  Bennett interpreted this to mean that appellant would have the complainant killed.  Bennett noted that

12

appellant and the complainant, who were having marital problems and arguments, were going to counseling. And three weeks before the murder, appellant and the complainant had both expressed that they wanted out of the relationship and planned to leave each other. Appellant told Bennett that the night the complainant was murdered, they had dinner, he fell asleep, and she woke him at 9:00 p.m. The complainant then left the house to get a Black & Mild cigar. Bennett thought this "strange" because when he was with the complainant earlier that morning, the complainant purchased two packages of tobacco that he used to roll his own cigarettes. Appellant told Bennett that she began trying to call the complainant around 10:00 p.m. Although appellant usually called Bennett when she was looking for the complainant because they were usually together, she did not call Bennett to look for the complainant until 7:30 to 8:00 a.m. the next morning when Bennett was at work. Bennett also noted that the complainant was aware of appellant's relationship with Jason, and when the family drove to the crime scene the day after murder, appellant seemed to know where she was going.

Mark Trigg, a division manager at Nationwide Insurance, testified about the life insurance policy that appellant had taken out on the complainant. Trigg explained that a few weeks before the complainant was murdered, his insurance coverage had been doubled to $300,000 and appellant was his designated beneficiary. Two life insurance policies were admitted into evidence; both became

13

effective August 28, 2009. The policy on the complainant was for $300,000 with appellant as the beneficiary.  The second policy was on appellant for $150,000 with the complainant as the beneficiary.  Trigg noted that a previous policy on the complainant for $150,000 had been taken out in 2006 and lapsed in 2008.  Trigg testified that appellant made a claim for payment under the complainant's life insurance policy on September 30, 2009, and Nationwide denied the claim at some time before March 2010.

## Sufficiency of the Evidence

In her second and third points of error, appellant argues that the evidence is insufficient to support her conviction, either as the primary actor or as a party to the complainant's murder, because the State presented no evidence that she fired a deadly weapon at the complainant or encouraged, directed, solicited, aided, or attempted to aid another in the commission of the offense.  In her first point of error, appellant argues that the trial court erred in instructing the jury on the law of parties because there was no evidence to support such an instruction.

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89

14

(1979)). Evidence is legally insufficient when the "only proper verdict" is acquittal. *Tibbs v. Florida*, 457 U.S. 31, 41–42, 102 S. Ct. 2211, 2218 (1982). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). In doing so, we give deference to the responsibility of the fact-finder to fairly resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from the facts. *Id.* We defer to the fact finder's resolution of conflicting evidence unless the resolution is not rational. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). However, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *See Williams,* 235 S.W.3d at 750.

Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). An inference, including one from circumstantial evidence, is a conclusion reached by considering other facts and deducing a logical consequence from them. *Id.* at 16. On the other hand, speculating is mere theorizing or guessing about the possible meaning of the facts and evidence presented. *Id.* A conclusion that has been reached by speculation may not be completely unreasonable, but it is not sufficiently based on

15

facts or evidence to support a finding beyond a reasonable doubt.  *Id.*  It is enough that the cumulative effect of all the incriminating facts is sufficient to support the conviction.  *See id.* at 13.

A person commits the offense of murder if she intentionally or knowingly causes the death of an individual, or if she intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.  *See* TEX. PENAL CODE ANN. § 19.02 (Vernon 2011).

Under the law of parties, a person is "criminally responsible" as a party to an offense if the offense is committed by her "own conduct, by the conduct of another for which [s]he is criminally responsible, or by both."  *See* TEX. PENAL CODE ANN. § 7.01(a) (Vernon 2011).  A person is "criminally responsible" for an offense committed by the conduct of another if, "acting with intent to promote or assist the commission of the offense, [s]he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense."  *See id.* § 7.02(a)(2) (Vernon 2011).

To establish guilt under the law of parties, the evidence must show that, at the time of the offense, the parties were acting together, each contributing some part towards the execution of their common purpose.  *See Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994); *Ahrens v. State*, 43 S.W.3d 630, 633–34 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd).  In determining whether a defendant participated in an offense as a party, the fact finder may examine the

16

events occurring before, during, and after the commission of the offense and may rely on actions of the defendant that show an understanding and common design to commit the offense. *Ransom*, 920 S.W.2d at 302; *Ahrens*, 43 S.W.3d at 634. Each fact need not point directly and independently to the guilt of the defendant, as long as the cumulative effect of all the incriminating facts are sufficient to support the conviction. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004); *see Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987). Circumstantial evidence may also prove party status. *Ransom*, 920 S.W.2d at 302.

In support of her sufficiency challenge, appellant asserts that there is no evidence that she "intentionally, knowingly, or unlawfully fired a deadly weapon at [the complainant], causing his death or that she caused his death by intentionally committing an act clearly dangerous to human life." She complains that there is no direct evidence that she shot the complainant with a firearm and the circumstantial evidence presented by the State was "incredibly weak." Appellant also asserts that the evidence is insufficient to prove that she acted as a party by encouraging, directing, soliciting, aiding, or attempting to aid another person in the commission of the murder.

The evidence shows that Clark saw the complainant's truck between 9:45 and 10:00 p.m. on September 12, 2009 in a secluded rural area of southeast Houston. The next morning, HPD officers found the complainant's body buckled

17

into the passenger seat of the truck and slumped over. They also found two spent .380 caliber shells outside the driver's side of the truck. The autopsy of the complainant's body shows that he had been shot once in the head and once in the shoulder. The direction of the wounds was consistent with the complainant having been shot in the position in which he was found, with the shooter standing outside the driver's door. This evidence supports a finding that someone intentionally and knowingly caused the complainant's death by shooting him with a firearm.

The jury also heard testimony that appellant and the complainant were in an unhappy marriage and both wanted out of the marriage. Neighbors and relatives testified about their frequent arguing, and appellant told HPD officers about her husband's infidelity and that she also had a relationship with Jason Miller during times when she was separated from the complainant. Appellant also told officers that she had moved out of their house and into an apartment four times during their marriage. This evidence reveals that appellant had a motive for killing the complainant. Although motive is not an element of the offense of murder, such evidence is relevant as a circumstance tending to prove guilt. *See Russo v. State*, 228 S.W.3d 779, 794 (Tex. App.—Austin 2007, pet. ref'd); *see also Clayton*, 235 S.W.3d at 781. Evidence of an affair during marriage may provide a motive, but it, standing alone, is not enough to connect a person to his or her spouse's death.

*Smith v. State*, 286 S.W.3d 412, 427 (Tex. App.—Corpus Christi 2008, pet. struck).

The State also presented evidence that appellant had a financial motive to murder the complainant. Parker testified that appellant had told her that she and the complainant were two months behind on their mortgage and she planned to let the house go into foreclosure. And appellant had renewed a life insurance policy on the complainant that became effective August 28, 2009, just two weeks before the complainant's murder. Moreover, appellant had doubled the insurance coverage from $150,000 to $300,000.

In regard to connecting appellant to the murder, the State presented extensive testimony from HPD officers about appellant's cellular telephone records, the calls made to and received from her cellular telephone the night the complainant was murdered, and appellant's inconsistent statements. Officer Taylor testified with a PowerPoint presentation, showing maps, derived from the records of the movement of appellant's cellular telephone the night of September 12, 2009. Appellant admitted to Officer Dillingham that she had her cellular telephone with her that night. And the records reveal that appellant made and received calls with her cellular telephone between 9:37 and 9:58 p.m. from a narrow area of Houston that included the crime scene at 14000 Mary Kay Lane. This evidence establishes her proximity to the crime scene around the time that

19

Clark first saw the complainant's truck and he was murdered. Appellant lived approximately 13 miles from the crime scene, and Taylor testified that appellant's residence is serviced by a different cellular telephone tower than the one servicing the crime scene area.

Moreover, appellant received a call on her cellular telephone from a pay telephone at the Chevron gas station near the crime scene, and then, minutes later, she placed two return calls to the same pay telephone. And appellant's cellular telephone records reveal that she placed a call to a cellular telephone assigned to "Marquis Sykes" at 9:49 p.m. and received calls back from "Marquis Sykes" at 9:49, 9:50, and 9:58 p.m. The telephone numbers for "Sykes" and the pay telephone at the Chevron gas station do not appear on appellant's cellular telephone records at any other time. Appellant's cellular telephone records also show calls made to the Millers' home telephone number an hour before and after the time of the complainant's death.

Officer Dillingham testified about several significant inconsistencies in appellant's statements regarding her whereabouts and activities on the night of the complainant's murder. In her first statement to Dillingham, appellant told him that she had not left home that night. In subsequent interviews, appellant told Dillingham that she had left her home to look for her husband when he had not come home. She added that she drove to the apartment of a friend near the

20

Astrodome, but when that friend was not there, she returned home around 9:30 p.m. Dillingham noted that although appellant told him that she had made calls to the complainant's cellular telephone around 8:30 p.m., the evidence showed that the only calls that she made to the complainant's cellular telephone after 2:58 p.m. occurred at 10:56, 11:12, and 11:31 p.m.

The jury also heard evidence from Edward Bennett that the complainant had confided to him that appellant had threatened him and told him "[t]hat she would have him did away with." Bennett interpreted this to mean that appellant would have the complainant, who wanted out of the marriage, killed.

Other testimony showed that appellant had information about the murder that had not been released by HPD. The morning after the murder, appellant told Glover that the complainant had been shot in the head. Officer Dillingham testified that he had only told appellant that the complainant had been found deceased and he purposefully did not provide additional information. Appellant also insisted that Richardson, the mortician, use September 12, 2009 as the date of the complainant's death for his funeral program, even though the death certificate from the medical examiner listed the date of death as September 13, 2009. And two relatives testified that appellant appeared to know where the crime scene was when they drove there the day after the complainant was murdered.

Viewing all of the evidence in the light most favorable to the verdict, the jury could have reasonably concluded that appellant's statements to Officer Dillingham were falsified to conceal her involvement in the commission of the murder of her husband. The State presented evidence that appellant was present in the vicinity of the murder when it occurred. And, although contradicted, the State presented evidence that appellant had knowledge about the complainant's death that only someone involved in the murder could have had. Thus, the jury was presented with evidence that appellant either assisted, or was assisted by another party, in the commission of the murder. The evidence supports two plausible, equally likely inferences as to the appellant's criminal responsibility for the complainant's death. The jury was free to accept either of those plausible inferences when it determined appellant's guilt. *See Evans v. State*, 202 S.W.3d 158, 165 (Tex. Crim. App. 2006).

In sum, the evidence is sufficient to support the jury's finding that appellant was responsible for the complainant's murder, either individually or as a party. Appellant had a motive and the opportunity to murder the complainant, and she made false statements during her first interview with the HPD officers about staying at home while the complainant was missing. She later made false statements about driving to a store to look for the complainant and then to the apartment of a friend near the Astrodome. Appellant's cellular telephone records

22

show that she was present in the vicinity of the crime scene that was 13 miles from her home at the time of the murder.  And she made telephone calls to and received telephone calls from a pay telephone at a gas station near the crime scene and the cellular telephone of another individual close to the same time.  This evidence reveals that she was not asleep at home as she told Officer Dillingham.  Although each piece of evidence may lack strength when considered "in isolation, the consistency of the evidence and the reasonable inferences drawn therefrom, provide the girders to strengthen the evidence" and support the jury's finding of the elements of the offense.  *See Swearingen v. State*, 101 S.W.3d 89, 97 (Tex. Crim. App. 2003).

Given the evidence, the jury could have concluded that appellant acted either individually or as a party to murder the complainant.  *See Guevara*, 152 S.W.3d at 50; *Hinojosa v. State*, 4 S.W.3d 240, 253 (Tex. Crim. App. 1999) (stating that suspicious behavior following murder can constitute a circumstance of guilt). Accordingly, we hold that the evidence is sufficient to support appellant's conviction for murder.

In support of her argument that the evidence is insufficient to establish her guilt as a party and the trial court erred in charging the jury on the law of parties, appellant relies on *Forbes v. State*, 513 S.W.2d 72 (Tex. Crim. App. 1974), *cert. denied*, 420 U.S. 910, 95 S. Ct. 830 (1975).  She asserts that the State was required

23

to prove the guilt of a third party as the primary actor. In *Forbes*, the court explained that in order to sustain the conviction of an accomplice, the State must prove the commission of the offense by the principal "to the same certainty as if the principal were on trial, and therefore beyond a reasonable doubt." *Id*. at 79. However, a more accurate statement of the law on the issue before us is that when a party is not the primary actor, the State must prove conduct constituting an offense plus an act by the defendant done with the intent to promote or assist such conduct. *Beier v. State*, 687 S.W.2d 2, 3 (Tex. Crim. App. 1985); *Miller v. State*, 83 S.W.3d 308, 313 (Tex. App. —Austin 2002, pet. ref'd).

Nevertheless, we note that even if the evidence were insufficient to show appellant's guilt as a party to the murder, and the trial court erred in submitting a parties instruction, any such error would be harmless when the "evidence clearly supports a defendant's guilt as a principal actor." *Ladd v. State*, 3 S.W.3d 547, 564-65 (Tex. Crim. App. 1999) (citing *Black v. State*, 723 S.W.2d 674, 675 (Tex. Crim. App. 1986)). Here, as outlined above, the evidence supports appellant's guilt as the principal actor. *See id*.

Having held that the evidence is sufficient to support appellant's conviction either as the primary actor or as a party, we conclude that appellant would not have been harmed by the trial court's instruction to the jury on the law of parties.

We overrule appellant's first, second, and third points of error.

## Motion to Suppress

In her fourth point of error, appellant argues that the trial court erred in admitting into evidence her fourth recorded interview with Officer Dillingham given on November 2, 2009 because it was the product of a custodial interrogation and she should have been warned of her legal rights. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (Vernon 2005); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966). Appellant asserts that Dillingham had probable cause to arrest her and the probable cause was manifested by Dillingham's statements to her. The State argues that appellant has not preserved this complaint for review because her written motion to suppress the statement did not specifically assert her argument regarding custodial interrogation and she did not make any such argument at the hearing on the motion or at any other relevant time.

A motion to suppress is a specialized objection to the admission of evidence. *Rothstein v. State*, 267 S.W.3d 366, 373 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). "[A] complaint is not preserved for appeal unless it was made to the trial court 'by a timely request, objection or motion' that 'stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context.'" *Resendez v. State*, 306 S.W.3d 308, 312 (Tex. Crim. App. 2009) (quoting TEX. R. APP. P. 33.1); *see also* TEX. R. EVID. 103.

"The purpose of requiring a specific objection in the trial court is twofold: (1) to inform the trial [court] of the basis of the objection and give [it] the opportunity to rule on it; (2) to give opposing counsel the opportunity to respond to the complaint." *Resendez*, 306 S.W.3d at 312. To preserve error, a party "must be specific enough so as to 'let the trial [court] know what he wants, why he thinks himself entitled to it, and do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it.'" *Id.* at 313 (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)). A party fails to preserve error when the contention urged on appeal does not comport with the specific complaint made in the trial court. *See Rothstein*, 267 S.W.3d at 373.

We consider the context of the complaint to determine if the party preserved error. *See Resendez*, 306 S.W.3d at 313. Accordingly, we review appellant's motion to suppress and the suppression hearing to determine if the complaint was apparent from the context. *See id.* at 314–16; *Rothstein*, 267 S.W.3d at 374–75 & n.5; *see also Keeter v. State*, 175 S.W.3d 756, 760 (Tex. Crim. App. 2005) (stating that issue may be preserved for appeal when litigated during hearing on motion to suppress and legal and factual questions intertwined). If the correct ground for exclusion was obvious to the trial court and opposing counsel, waiver will not result from a general or imprecise objection. *Zillender v. State*, 557 S.W.2d 515,

26

517 (Tex. Crim. App. 1977).  However, if the context shows that a party failed to effectively communicate his argument, then the error is deemed waived on appeal. *Lankston*, 827 S.W.2d at 909.

Appellant argues that she preserved her complaint based on the arguments that she made in her written "Motion to Suppress Statements of Defendant."  In her written motion, appellant argued, in pertinent part, as follows:

> In support of the Motion, the Defendant would show this Honorable Court that at the time of any conversations between the Defendant and law enforcement officers, *the Defendant was either under arrest or substantially deprived of his freedom by the attendant conduct of said law enforcement officers and the surrounding circumstances*; or that the actions of law enforcement rendered the taking of the statement coercive and involuntary.  The Defendant was interrogated by officers.
>
> . . .
>
> That any oral statement as well as any evidence or testimony developed as a result of the oral statement was tainted by the illegal and unlawful detention or arrest of the Defendant herein, in violation of the Defendant's constitutional rights under the Fifth and Fourteenth Amendment to the United States Constitution; Art. 1, § 9 of the Texas Constitution; and Tex. Code Crim. Proc. Art. 38.22.  Any statement given by the Defendant was not voluntary.
>
> That any oral statement taken from the Defendant was taken in violation of Tex. Code Crim. Pro. Art. 38.22 § 3, because the procedures of Art. 38.22 § 3 were not followed in the taking of the alleged oral statement(s) of the Defendant.

(Emphasis added.) From the express argument made in her motion, we conclude that appellant has preserved her complaint for our review.

We review a ruling on a motion to suppress a defendant's statement for an abuse of discretion. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). We generally consider only the evidence adduced at a suppression hearing unless the parties consensually re-litigate the issue at trial, in which case we also consider relevant trial testimony. *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). We give almost total deference to a trial court's determination of historical facts, especially if those determinations turn on witness credibility or demeanor, and review de novo the trial court's application of the law to facts not based on an evaluation of credibility and demeanor. *Neal v. State*, 256 S.W.3d 264, 281 (Tex. Crim. App. 2008). At a suppression hearing, a trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). Accordingly, a trial court may choose to believe or to disbelieve all or any part of a witness's testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). When the trial court makes findings of fact with its ruling on a motion to suppress, an appellate court does not engage in its own factual review, but determines only whether the record supports the trial court's factual findings. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). Unless a trial court abuses its discretion in making a finding not

supported by the record, we will defer to the trial court's fact findings and not disturb the findings on appeal. *Cantu v. State*, 817 S.W.2d 74, 77 (Tex. Crim. App. 1991).

The appropriate inquiry as to whether a person is "in custody," for purposes of their right to receive legal warnings is "'whether there is a formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520 (1983); *Gardner v. State*, 306 S.W.3d 274, 293–94 (Tex. Crim. App. 2009). A "custodial interrogation" is questioning that is initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way. *See Herrera v. State*. 241 S.W.3d 520, 525 (Tex. Crim. App. 2007).

The Texas Court of Criminal Appeals has recognized four factors relevant to determining custody: (1) probable cause to arrest; (2) the subjective intent of the law enforcement officers; (3) the focus of the investigation; and (4) the subjective belief of the defendant. *See Meek v. State*, 790 S.W.2d 618, 620 (Tex. Crim. App. 1990). Factors two and four are relevant only to the extent that they may have been manifested in the words or actions of law enforcement; the custody determination is based only on objective circumstances. *See Stansbury v. California*, 511 U.S. 318, 114 S.Ct. 1526, 1528–30 (1994); *Dowthitt v. State*, 931

S.W.2d 244, 254 (Tex. Crim. App. 1996). Questioning at a police station does not, in and of itself, constitute a custodial interrogation. *See Beheler*, 463 U.S. at 114–25, 103 S. Ct. at 3519-20. However, simply because an interrogation begins as "noncustodial" does not preclude custody from arising later if police conduct causes a "consensual inquiry to escalate into [a] custodial interrogation." *See Dowthitt*, 931 S.W.2d at 255.

Four general situations may constitute custody: (1) when the suspect is physically deprived of his freedom of action in any significant way; (2) when a law enforcement officer tells the suspect that he or she cannot leave; (3) when the law enforcement officer creates a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) there is probable cause to arrest and the officer does not tell the suspect that he or she is free to leave. *Id.*; *see also Shiflet v. State*, 732 S.W.2d 622, 629 (Tex. Crim. App. 1985). *Stansbury* instructs us that in the first through the third situations, the restriction upon freedom of movement must amount to the degree associated with an arrest rather than an investigative detention. *Dowthitt*, 931 S.W.2d at 255. Under the fourth situation, *Stansbury* dictates that the law enforcement officer's knowledge of probable cause must be manifested to the suspect. *Id.* This manifestation could occur if information substantiating probable cause is related by the officers to the suspect or by the suspect to the officers. *Id.* Because probable

30

cause is merely a factor, the occurrence of situation four does not automatically establish custody. *Id.* Custody will only then be established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he or she is under restraint to the degree associated with an arrest. *Id.*

Here, in her fourth interview, appellant met Officer Dillingham at a police station. Appellant acknowledged in the recorded statement that she was there voluntarily and was making the statement voluntarily. Appellant was informed that she would be allowed to leave the police station and go home. And Dillingham testified at the suppression hearing that he told appellant that she would be free to leave after the interview. The officers did confront appellant with her cellular telephone records and point out that the records contradicted her previous statements made to them about her whereabouts the night that the complainant was murdered. However, the officers did not tell appellant that she was a suspect or that they had probable cause to arrest her. Neither Dillingham nor his partner told appellant that she was under arrest or that she could not leave.

In fact, during the interview, appellant asked Officer Dillingham if he was going to "lock her up." Dillingham replied,

> No, I'm not going to lock you up Brenda. I told you, I'm a man of my word. You came down here voluntarily, and I appreciate it. For the fourth time you've helped me. This is your chance to help me understand the numerous amounts of

31

inconsistencies.  None of this stuff is making sense.  I'm showing you where you were that day, the whole day I can map your whole day out. . . . Up until the time you were there when Perry got killed.

He later told appellant, "Give us a second.  We're going to wrap this up today and let you get on out of here.  Like I said, I want to thank you for coming. . . . Give us a couple of minutes and then we'll get you on your way Brenda."  At the end of the interview, Dillingham told appellant, "All right, well this is it.  We going to let you go home.  I mean like I told you.  We worked on it hard and, uh, it ain't what you know, it's what you can prove, so we appreciate you coming in."

Contrary to appellant's assertions, the evidence establishes that she was not in custody during her fourth interview with Officer Dillingham and subject to a custodial interrogation.  Accordingly, we hold that the trial court did not err in denying appellant's motion to suppress her statement and admitting it into evidence.

We overrule appellant's fourth point of error.

**Admission of Hearsay**

In her fifth point of error, appellant argues that the trial court erred in admitting into evidence testimony by Edward Bennett that his brother, the complainant, told him that appellant had threatened to "have him did away with" because the statement did not reflect the complainant's state of mind and was

32

offered to prove that an event occurred, specifically that appellant threated the complainant. *See* TEX. R. EVID. 803.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *See Rodriguez v. State*, 203 S.W.3d 837, 841 (Tex. Crim. App. 2006). Therefore, we will not reverse a trial court's ruling as long as it is within the "zone of reasonable disagreement." *See id.*

Hearsay is a statement, other than one made by the declarant while testifying at trial, that is offered to prove the truth of the matter asserted. *See* TEX. R. EVID. 801(d). Hearsay statements are generally inadmissible. *See* TEX. R. EVID. 802. A statement of the declarant's then-existing state of mind may be excepted from the general exclusion of hearsay evidence. *See* TEX. R. EVID. 803(3). Determining whether an out-of-court statement will fall under an exception to the hearsay rule is within the trial court's discretion. *See Coffin v. State*, 885 S.W.2d 140, 149 (Tex. Crim. App. 1994).

Here, the trial court conducted a hearing on the admissibility of Bennett's testimony outside the presence of the jury. Appellant complained of the statement as hearsay. The State argued in response that the testimony was not offered to establish the truth of the matter, but to show the relationship between appellant and the complainant and the complainant's then state of mind, i.e., of his concern,

fearfulness, and desire to leave the marriage. *See* Tex. Code of Crim. Proc. Ann. art. 38.36 (Vernon 2005); Tex. R. Evid. 803(3).

Assuming without deciding that Bennett's testimony constituted hearsay, we hold that any error in the admission of the testimony was harmless because the same or similar evidence was admitted at another point in the trial without objection. *See* Tex. R. App. P. 44.2(b).

The State offered into evidence redacted versions of appellant's four interviews with HPD officers. During the fourth interview, Officer Dillingham asked appellant about statements made by other witnesses that she had threated the complainant's life. Dillingham asked her specifically about statements made by the complainant on Labor Day, two weeks before he was murdered, that she would have him "did away with." Dillingham also asked appellant about allegations that she had threatened the complainant and a woman that she had found him with on New Year's Day in 2009 when appellant suspected that they were having an affair. Appellant's only objection to the introduction of the redacted interviews into evidence was the very general statement, "based on the previous hearing." Appellant did not object to the admission of the portion of her police interview in which she was questioned about statements made by the complainant to others that she had threatened his life, nor did she argue that these statements were inadmissible as hearsay. Likewise, appellant did not object to the admission of the

34

portion of the interview in which she was questioned about allegations of threats that she made to the complainant on New Year's Day. There is no indication in the record that appellant sought to have that portion of the recording redacted from the State's exhibit. The "improper admission of evidence is not reversible error if the same or similar evidence is admitted without objection at another point in the trial." *Chapman v. State*, 150 S.W.3d 809, 814 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). Any error is, therefore, harmless. *See Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); *Lacaze v. State*, 346 S.W.3d 113, 122 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd).

We overrule appellant's fifth point of error.

## Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Sharp.

Publish. TEX. R. APP. P. 47.2(b).