In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-17-00017-CR
_____

RONNIE COFTY JR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 1st District Court
Jasper County, Texas
Trial Cause No. 12748JD

## MEMORANDUM OPINION

A jury convicted appellant Ronnie Cofty Jr. of aggravated robbery and assessed punishment at thirty years of confinement. In his sole appellate issue, Cofty argues that the evidence was legally insufficient to support his conviction. We affirm the trial court's judgment.

BACKGROUND

A grand jury indicted Cofty for aggravated robbery. The indictment alleges that Cofty

1

while in the course of committing theft of property and with intent to obtain or maintain control of the property, intentionally and knowingly threaten[ed] or place[d] [J.P.] in fear of imminent bodily injury or death, and the defendant knew that a deadly weapon, to wit: a revolver, would be used or exhibited during the commission of or immediate flight from said offense[.]

Lieutenant Ryan Cunningham of the Jasper County Sheriff's Office testified that he was dispatched to the robbery, and he took J.P.'s statement. Cunningham testified that J.P. described the robbery and indicated a white male with a limp, a white female, and a black male, who had a silver revolver and a blue bandana covering his face, were involved in the robbery. Cunningham also spoke with J.P.'s daughter, F.P., and J.P.'s father, T.S., who were both in the vehicle when the robbery occurred. Cunningham testified that he recovered two bullet fragments from the scene of the robbery. Cunningham explained that he executed a warrant for Cofty's arrest at a house that was located approximately two miles from where the robbery occurred, and Cunningham observed that Cofty had a limp. Cunningham testified that he also arrested Katy Shaw, who had an active warrant, at that same location.

Cunningham testified that he also interviewed J.C., Cofty's sister, who gave him a written statement that included information that Cofty had told J.C. regarding the robbery. According to Cunningham, J.C. stated that Cofty told her that he had tried to "jack" a man, woman, and girl who had picked him up. According to J.C.'s statement, Cofty had the woman who picked him up drive him to J.C.'s

2

grandmother's house, where Jamar Tukes pulled a gun to make it look like they were all getting "jacked[.]" In her statement, J.C. explained that Cofty told her that Tukes pointed the gun at Shaw and told her to come with him, and Cofty ran into the woods.

Cunningham testified that he interviewed Cofty, and a recording of that interview was admitted into evidence. During the interview, Cofty stated that the alleged victims of the robbery, two women and an old man, picked him and his girlfriend up and took them to his grandmother's house. Cofty stated that when he got out of the vehicle, he heard three gunshots, and when he looked to see what had happened, Cofty saw two people running from the vehicle. According to Cofty, when he got back to the vehicle, he saw a gray car speeding away, and the woman driving the vehicle pointed a gun at him and told him that some pills were stolen. Cofty stated that the woman told him that his girlfriend knew the black male in the car and left with him, but Cofty claimed that his girlfriend had told him that the gunman had pointed the gun at her and told her to get into his car. Cofty claimed that he did not know the black male or what had happened. Cofty also denied texting on Shaw's cell phone before the robbery occurred. Cofty stated that he got scared and ran away because the woman pulled a gun on him.

During his interview, Cofty claimed that Shaw had put him in the middle of the situation and may have had something to do with the robbery. According to

3

Cofty, Shaw was at J.C.'s house when he got back there, but Shaw never told him how she had gotten away from the gunman. Later in the interview, Cofty stated that the gunman was Jamar Tukes and that Shaw had texted Tukes and told him where they would be. Cofty claimed that he had nothing to do with setting up the robbery, but he admitted that he did not give Shaw's correct name to the woman.

J.P. testified she was in Jasper with F.P. and T.S when she saw a boy and a girl walking down the highway. J.P. testified that the boy was limping and it was chilly outside, so she stopped to see if they needed a ride. J.P. explained that the boy introduced himself as Jimmy and the girl as Carol, and he gave her directions to his grandmother's house. According to J.P., Jimmy was on his cell phone texting while he was giving her directions. J.P. testified that when they reached to the house, Jimmy got out and left the passenger door open, and Carol, a white female, stayed in the vehicle. J.P. explained that after Jimmy yelled something from around the corner, a car pulled in behind her vehicle, and Carol stated that it must be Jimmy's grandmother. J.P. testified that a black male with a blue bandana over his face then tapped on the passenger window with a gun and told them to roll down the window. J.P. testified that when T.S. rolled down the window, the gunman pointed the gun at T.S., told them to give him everything they had, and shot the gun into the air.

J.P. testified that she told the gunman that she did not have any money, and the gunman pointed the gun at her and asked her if she was ready to die. J.P. testified that the gunman took her cell phone and keys, and Carol gave the gunman a bag containing J.P.'s prescription medication and approximately seventy dollars in cash. J.P. explained that she later discovered that T.S.'s medication was also gone. According to J.P., after Carol gave the gunman the medication, Carol slipped out the door and left with the gunman. J.P. testified that when Jimmy returned to the truck, he asked her about what had happened and about where Carol was, and Jimmy told her that Carol did not have anything to do with the robbery. J.P. explained that when Jimmy learned that F.P. had called 9-1-1, Jimmy gave them the wrong directions to report to the police and then left because he had a warrant. J.P. also testified that there was a gun in her vehicle, but no one used it during the robbery. J.P. testified that she was scared during the robbery, and she thought the gunman was going to kill them. J.P. also explained that T.S. was in poor health and could not testify at trial because he was in the hospital.

F.P. testified that she was in Jasper with J.P. and T.S. when J.P. picked up two people walking along the road. F.P. described the people as being a white male with a limp and a white female. F.P. testified that the male, who identified himself as Jimmy and the female as Carol Hollis, gave J.P. directions to his grandmother's

5

house, and when they arrived, Jimmy got out to check if anyone was home and Carol waited in the vehicle. According to F.P., Jimmy was gone for five to ten minutes when he explained that nobody was at home and he was looking for a key.

F.P. testified that while Jimmy was gone, a silver or gray vehicle pulled in the driveway behind them, and Carol stated that it was probably Jimmy's grandmother. F.P. testified that a black male with a bandana around his face got out of the silver vehicle and told T.S. to roll down the window, and the black male pointed a gun at T.S. and demanded everything they had. According to F.P., when J.P. told the gunman that they did not have anything, the gunman shot into the air and then pointed the gun back at T.S. F.P. testified that the gunman took J.P.'s cell phone and car keys, and Carol gave the gunman J.P.'s medication and then willingly got into the gunman's car. F.P. further testified that the gunman did not point his gun at Carol or order Carol to get into his car. F.P. explained that the gunman shot at their tires and then left.

F.P. explained that after the gunman left, Jimmy came back to their vehicle and asked what had happened and offered to help change the tire, but Jimmy took off when he saw F.P. had called 9-1-1. According to F.P., Jimmy told them he had warrants and then left on foot. F.P. explained that she was scared when the gunman tapped on their window with the revolver, and she believed she was going to die.

6

F.P. also testified that there was a gun in their vehicle under the driver's seat, but nobody used that gun during the robbery.

Randall McClelland testified that he lived near the location where the robbery occurred. McClelland testified that he was outside in his barn working when he observed a little, silver car slowly drive by, and a minute later, he heard two or three gunshots. McClelland testified that shortly after hearing the gunshots, the silver car passed by his house again at a high rate of speed.

J.C. testified that the day after the robbery occurred, she talked to Cofty, and according to J.C., Cofty told her that he and his friend, Katy Shaw, tried to "jack" some people who had picked them up on the side of the road. J.C. testified that Cofty told her that a man, woman, and a girl drove him and Shaw to Cofty's grandmother's house on County Road 249. J.C. explained that their grandmother has a camper on County Road 249, but she did not live there when the robbery occurred. According to J.C., Cofty stated that after he arrived at his grandmother's house, Jamar Tukes pulled up behind them, pulled out a gun, shot out their tire, pointed the gun at Shaw, and told Shaw to come with Tukes. J.C. testified that Cofty told her that he ran into the woods, and Shaw left with Tukes. J.C. explained that after the robbery, Cofty called and asked their father to pick him up. J.C. testified that Cofty and Shaw were arrested at her home. J.C. explained that she felt

intimidated when she gave her statement to Lieutenant Cunningham, because J.C. thought Cunningham would arrest her if she did not give a statement.

In the jury charge, the trial court instructed the jury that a person is guilty of aggravated robbery if he commits the offense of robbery and uses or exhibits a deadly weapon. The trial court instructed the jury that "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both." The trial court also instructed the jury that "[e]ach party to an offense may be charged with the commission of the offense[,]" and "[a] person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids or attempts to aid the other person to commit the offense." The trial court further instructed the jury that Cofty was guilty of aggravated robbery if the jury found, beyond a reasonable doubt, that Cofty knew that a deadly weapon, a revolver, would be used or exhibited during the commission of or immediate flight from the offense. The jury found Cofty guilty of aggravated robbery. Pursuant to the jury's punishment verdict, the trial court sentenced Cofty to thirty years of confinement and entered a deadly weapon finding. Cofty appealed.

ANALYSIS

In his sole issue on appeal, Cofty challenges the legal sufficiency of the evidence. According to Cofty, the evidence failed to show that in the course of committing theft of property, he knowingly and intentionally threatened or placed J.P. in fear of imminent bodily injury or death, and also failed to show that he knew that a deadly weapon would be used or exhibited during the commission of or immediate flight from the alleged offense. Cofty argues that there is no physical evidence linking him to the aggravated robbery other than his presence at the scene and the arrest of an alleged co-defendant at the same location as Cofty.

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The fact finder is the ultimate authority on the credibility of witnesses and the weight to be given their testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981). We give full deference to the fact finder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must

9

presume that the fact finder resolved such facts in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We also "'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 16-17).

A person commits aggravated robbery if (1) "in the course of committing theft" and "with intent to obtain or maintain control of the property," he "intentionally or knowingly threatens or places another in fear of imminent bodily injury or death[;]" and (2) "uses or exhibits a deadly weapon[.]" Tex. Penal Code Ann. §§ 29.02(a), 29.03(a) (West 2011). A firearm is a deadly weapon *per se*. *Ex parte Huskins*, 176 S.W.3d 818, 820 (Tex. Crim. App. 2005). "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." Tex. Penal Code Ann. § 7.01(a) (West 2011). A person is criminally responsible for an offense committed by another when, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]" *Id*. § 7.02(a)(2) (West 2011). "Each party to an offense may be charged with commission of the offense." *Id*. § 7.01(b) (West

10

2011). "[C]ircumstantial evidence may be used to prove party status." *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994).

To establish that Cofty committed the offense of aggravated robbery under the law of parties, the State had to prove that Cofty, with the intent to promote or assist the commission of the offense, solicited, encouraged, directed, aided, or attempted to aid in the commission of the offense. *See Rodriquez v. State*, 521 S.W.3d 822, 828 (Tex. App.—Houston [1st Dist.] 2017, no pet.). Thus, under the law of parties, the evidence must show that, at the time of the offense, the parties were acting together, each contributing some part toward the execution of their common design to commit the offense. *Nelson v. State*, 405 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). Although circumstantial evidence may be used to prove status as a party, there must be sufficient evidence showing an understanding and common design to commit the offense. *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012); *Guevara v. State*, 152 S.W. 3d 45, 49 (Tex. Crim. App. 2004). As long as the cumulative effect of the facts is sufficient to support the defendant's conviction under the law of parties, each fact need not have to point directly to the defendant's guilt. *Guevara*, 152 S.W. 3d at 49. To determine whether a defendant participated in an offense, a jury may consider "events occurring before, during and after the commission of the offense, and may rely on

11

actions of the defendant which show an understanding and common design to do the prohibited act." *Ransom*, 920 S.W.2d at 302.

"A conviction for an aggravated offense must be supported by evidence that the defendant committed, or was criminally responsible for committing, the aggravating element." *Wyatt v. State*, 367 S.W.3d 337, 340-41 (Tex. App.—Houston [14th Dist.] 2012, pet. dism'd) (citing *Stephens v. State*, 717 S.W.2d 338, 340 (Tex. Crim. App. 1986)). With respect to party liability for the use or exhibition of a deadly weapon, there must be direct or circumstantial evidence that the defendant not only participated in the robbery before, while, or after a deadly weapon was displayed, but the defendant did so while being aware that a deadly weapon would be, was being, or had been used or exhibited during the offense. *Id.* at 341. Thus, before the jury could find Cofty guilty of aggravated robbery, the jury had to believe, beyond a reasonable doubt, that Cofty knew that a deadly weapon would be used or exhibited during the commission of or immediate flight from the robbery. *See Jackson v. State*, 487 S.W.3d 648, 656 (Tex. App.—Texarkana 2016, pet. ref'd); *Young v. State*, 428 S.W.3d 172, 178 (Tex. App.—Houston [1st Dist.] 2014, pet ref'd).

The jury heard evidence that J.P. and F.P. were placed in fear of imminent bodily injury or death, when the gunman, who Cofty identified as Tukes, pointed a gun at them, demanded everything they had, took J.P.'s cell phone, keys, medication,

and money, and shot out their tire. The jury heard evidence that Cofty gave incorrect names, the incorrect location, and claimed that Shaw had texted Tukes their location to set up the robbery. The jury heard J.P. testify that it was Cofty who was texting on a cell phone while he was giving her directions to his grandmother's house. The jury also heard evidence that Cofty fled the scene.

In addition, the jury heard evidence from J.C., who was unconnected with the alleged offense and who testified that, after the alleged offense, Cofty told her that he and Shaw tried to "jack" some people who had picked them up on the side of the road. The jury heard evidence from J.C. that Cofty told her that he had the woman who picked him up drive him to their grandmother's house, where Tukes pulled a gun to make it look like they were all getting "jacked[.]" The jury heard J.C. testify that their grandmother did not currently live at the location where the alleged robbery occurred, but Cofty had claimed that he got out of the vehicle to see if anyone was home. The jury also heard J.C. testify that Cofty stated that after they arrived at his grandmother's house, Tukes pulled up, pulled out a gun, shot out a tire, pointed the gun at Shaw, and told Shaw to come with Tukes. The jury also heard testimony that Carol slipped out the door and willingly left with the gunman, who Shaw seemed to know. The jury also considered evidence that after the robbery occurred, Cofty and Shaw were together at J.C.'s house, but Cofty claimed that Shaw never told him how

13

she had gotten away from the gunman. Based on the events that occurred before, during, and after the offense, the jury could reasonably conclude that Cofty was criminally responsible as a party to the offense. *See* Tex. Penal Code Ann. §§ 7.01(a), 7.02(a)(2); *see also Gross*, 380 S.W.3d at 186; *Ransom*, 920 S.W.2d at 302. Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found, beyond a reasonable doubt, that Cofty knew that a deadly weapon would be used or exhibited during the commission of or immediate flight from the robbery. *See Jackson*, 487 S.W.3d 657. Viewing all the evidence in the light most favorable to the verdict, the jury could conclude, beyond a reasonable doubt, that Cofty committed the offense of aggravated robbery. *See* Tex. Penal Code Ann. §§ 29.02(a), 29.03(a); *Jackson*, 443 U.S. at 319; *see also* Tex. Penal Code Ann. § 7.01(b); *Hooper*, 214 S.W.3d at 13. Accordingly, we overrule Cofty's sole issue and affirm the trial court's judgment.

AFFIRMED.

_____
STEVE McKEITHEN
Chief Justice

Submitted on June 26, 2018
Opinion Delivered August 15, 2018
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.

14