

# NUMBERS 13-22-00583-CR, 13-22-00584-CR, 13-22-00585-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**MICAH ALLEN TOBAR,**                                   **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                       **Appellee.**

---

# ON APPEAL FROM THE 23RD DISTRICT COURT
# OF MATAGORDA COUNTY, TEXAS

---

# MEMORANDUM OPINION

**Before Justices Benavides, Longoria, and Silva**
**Memorandum Opinion by Justice Longoria**

After a bench trial, appellant Micah Allen Tobar was convicted of capital murder, *see* TEX. PENAL CODE ANN. § 19.03(a)(2), aggravated robbery, *see id.* § 29.03, and tampering with evidence. *See id*. § 37.09(c).[1] Tobar was sentenced to life in prison for

---

[1] Appellate cause number 13-22-00583-CR corresponds to trial court cause number 18-146,

the capital murder offense, twenty years' incarceration for the aggravated robbery offense, with a deadly weapon finding, and ten years' incarceration for the tampering with evidence offense, to run concurrently.[2] On appeal, Tobar argues that the evidence was insufficient to support his conviction for capital murder and that the trial court erred in the admission of certain evidence. We affirm.

## I.  BACKGROUND

The body of Devin Davolos was discovered in the Brazos River. Davolos's cause of death was determined to be multiple gunshot wounds. At trial, the State elicited the following relevant testimony.

Dr. Erin Barnhart, the chief medical examiner for Galveston County, performed the autopsy of Davalos. Dr. Barnhart testified that Davalos was shot ten times. He was shot in the face, head, and other areas of his body. While she could not opine on the order of the shots due to the body's state of decomposition, she explained that he was shot nine times before the final shot to his head killed him. Dr. Barnhart explained that this was determined based on the internal bleeding associated with all the wounds. She testified that there would be no internal hemorrhaging after the fatal shot. Projectiles were recovered from the body and turned over to law enforcement.

Liza Davalos, Davalos's mother, testified that Davalos had gone out to drive around and be with friends. Davalos did not come home that night and was still not home

---

appellate cause number 13-22-00584-CR correlates to trial court cause number 18-147, and appellate cause number 13-22-00585-CR corresponds to trial court cause number 18-148.

[2] Tobar was sixteen years old at the time of the murder. He was certified to stand trial as an adult.

the next morning. When Davalos did not appear for work, Liza reported him missing. Later, law enforcement contacted Davalos's brother Derrick to inform him that his vehicle, which Davalos had been using, was found damaged. The police later informed Liza and her family that Davalos had been shot and killed three days before his eighteenth birthday.

Liza explained that Davalos had a close friendship with Matthew Gonzales, someone he met in school. The police told Liza that Davalos was killed by Gonzales, Tobar, and Michael Trevino.

A close friend of Davalos, Samantha Charles, testified that she and Davalos were friends with Gonzales, but that she did not personally know Tobar or Trevino. Charles explained that she was aware of a sexual relationship between Davalos and Gonzales. On the evening of the murder, Davalos and Gonzales stopped at the gas station convenience store where Charles worked. Davalos got gas for his vehicle and he and Gonzales purchased some drinks and snacks. Charles explained that she and Davalos had a slight disagreement because she did not think he should be with Gonzales. Charles testified that Davalos had begun dating another man and she did not understand why he was spending time with Gonzales. According to Charles, Davalos had a brief history with drug use and selling drugs, and Davalos obtained the drugs from Jesse Cervantes. She also testified that at the time of his death, Davalos was not using or selling drugs anymore.

David Chauvin, a Texas Ranger with the Texas Department of Public Safety (DPS), testified that he assisted in the investigation into Davalos's murder. Ranger Chauvin was initially called in for assistance after Derrick's burned vehicle had been located and law enforcement agencies treated Davalos's disappearance as a missing

3

persons case, which he explained "was likely going to lead into a homicide investigation." Davalos's body was located in the Brazos River the same day. After the body was located, the police first identified Gonzales and Trevino as suspects. Later, Tobar was also identified as a suspect. After multiple interviews of the suspects, Ranger Chauvin testified that investigators were able to determine that Davalos was shot in multiple locations across different parts of the city. From the interviews, Ranger Chauvin was able to determine that there were four locations involved in Davalos's murder: the initial shooting scene, a second shooting scene, the location where the body was dumped into the Brazos River, and the location where Davalos's car was burned.

Ranger Chauvin, along with Trevino and an officer from Bay City, went to the locations. At one of the locations, a drink cup similar to the one Charles described Gonzales purchasing at the convenience store was located. After searching the vicinity of that cup, Ranger Chauvin located seven .22 caliber bullet casings. At the other location, two shell casings were collected. Surveillance footage from buildings in the vicinity of the locations appeared to show Derrick's vehicle traveling in the area just after midnight on the night of the murder. The video footage later shows three males walking along the railroad tracks toward Gonzales's home just after the time that Davalos's vehicle was dumped and burned. Gonzales lived with his sister and her husband, Cervantes. Cervantes was also interviewed. Ranger Chauvin further testified that during the course of the investigation, he obtained a handwritten letter, purportedly written by Tobar.

On cross-examination, Ranger Chauvin explained that he interviewed the suspects several times. According to Ranger Chauvin, Gonzales's version of events

4

varied in his interviews, and he was also able to determine that various portions of Trevino's story were untrue. The .22 caliber rifle was not recovered. As part of the investigation, search warrants were executed, and the suspects' cellphones were obtained by law enforcement. The only clothing that was submitted for testing was worn by Gonzales, no clothing from Tobar or Trevino was collected and submitted for testing. Ranger Chauvin testified that there was no DNA evidence linking Tobar to the murder. Ranger Chauvin understood that there was an agreed-to stipulation that Tobar did not fire a weapon at Davalos.

Cervantes testified that at the time of Davalos's murder, he was living with his girlfriend, his daughter, and his girlfriend's brother, Gonzales. Cervantes said that Davalos was a close friend of Gonzales. According to Cervantes, Gonzales and Trevino are cousins and Tobar is their friend. Cervantes recalled waking up to the sound of Gonzales, Trevino, and Tobar in his home around 6:00 a.m. before the sun had come up. When he went to see what was going on, he said that he found the three of them together in the bathroom and they appeared "scared, nervous," and "terrified." He said that Tobar stated that he was "trying to make sure [they] did it right because he's scared and nervous too." Cervantes stated that he was not sure what that meant until Tobar said "they killed him." Tobar told Cervantes that they had killed Davalos in the trunk and that Tobar had "helped and broke his leg." After the discussions in the bathroom, Cervantes took the three of them to a Wells Fargo bank ATM machine where they attempted to retrieve money using Davalos's debit card. After that, Cervantes testified that he told the three of them that they could not come to his house. Trevino and Gonzales were later arrested at

5

Cervantes's home.

On cross-examination, Cervantes described Trevino as violent and controlling, labeling Trevino's friends as "submissive." According to Cervantes's statement to the police and his testimony at trial, people were afraid of Trevino, who had been convicted of murder in the past. Cervantes testified that Trevino had threatened him and his family if he were to go to law enforcement about what had happened. According to his statement to police, Cervantes said that Tobar asked Trevino for permission before speaking to Cervantes the morning after the shooting.

Gonzales testified that he was currently incarcerated and had been since October of 2017 for the murder of Davalos. He admitted that he, Trevino, and Tobar murdered Davalos. Gonzales stated that Trevino and Tobar were "homeboys or friends" and that Trevino was more aggressive and dominant in the friendship. As for his relationship with Davalos, Gonzales stated that they had a sexual relationship. Gonzales explained that Davalos was going to tell "everybody" that they were in a sexual relationship, which upset Gonzales. In order to prevent Davalos from telling others about their relationship, Gonzales made a plan to "scare" Davalos by "beat[ing] him up" and "tell[ing] him not to say anything about [the relationship]." Gonzales enlisted the help of his cousin, Trevino. The general plan was to beat Davalos up in the back of Gonzales's house in the evening. Gonzales admitted that Trevino had two guns he had been keeping at Gonzales's house and that the plan "to scare" Davalos included using one of the guns.

The evening of the murder, Gonzales and Davalos met up when Davalos got out of work. Gonzales recalled that they went to the gas station, where they saw Charles at

6

work. They purchased drinks and snacks. While they were at the gas station, Gonzales was in contact with Trevino to let him know that he and Davalos were on their way back to Gonzales's house. Gonzales and Davalos left the gas station and drove to Gonzales's house. When they arrived, they parked and sat in the car for a bit. Trevino and Tobar then came out of Gonzales's house with guns raised. Trevino had a .22 caliber rifle and Tobar was wearing a mask and carrying a shotgun. Gonzales did not expect that Tobar was going to be with Trevino. When Trevino and Tobar approached the vehicle, Trevino pulled Gonzales out of the car and "threw [him] out and kicked [him] twice in the ribs" while telling him to "shut up." Tobar had the gun pointed at Davalos. Trevino then went to the driver's side of the vehicle and "ordered" Davalos out of the vehicle. Davalos and Gonzales were on the ground next to the vehicle. Trevino kicked Gonzales again. Tobar was taking Davalos's phone and credit cards. Trevino then directed Davalos to open the trunk of the vehicle and to get inside. Trevino closed Davalos in the trunk and told Gonzales to get into the vehicle. Trevino got into the driver's side and Tobar sat in the passenger's side, still carrying the shotgun.

Trevino then drove the vehicle away. While they were driving near "the creek," Davalos was able to pop the trunk open from the inside. Trevino began to swerve the vehicle until they got off of the bridge and he stopped the vehicle. Gonzales stated that Trevino then exited the vehicle with the .22 caliber rifle, went to the trunk and "shot twice." Trevino then closed the trunk and got back into the car. As they continued to drive, they could hear sounds coming from Davalos in the trunk as though he were "choking on his blood." Trevino stopped the vehicle again and told Gonzales to drive. Trevino got into the

7

back seat and Gonzales was told to drive "[t]o the land." During the drive, Tobar asked Gonzales for the password to Davalos's phone, which Gonzales knew and told Tobar. When they got to "the land," Gonzales, Trevino, and Tobar exited the vehicle. Gonzales then opened the trunk and Davalos was "twitching" but was not saying anything and he had his eyes closed. Trevino and Tobar were still carrying the guns at this time. Gonzales was given the .22 caliber rifle and he shot Davalos, testifying that he had "snapped" and let out "all [his] anger." Gonzales testified that "[a]fter [he] shot [he] just kept on shooting." He then gave Trevino the gun back and Trevino "punched [Davalos] in the chest" and closed the trunk. Tobar did not fire any weapons.

Trevino got into the driver's seat, Gonzales got into the passenger's seat, and Tobar got into the backseat. Trevino drove the vehicle to the river and stopped underneath a bridge. Trevino popped the trunk and he, Gonzales, and Tobar got out of the vehicle. Trevino and Gonzales pulled Davalos out of the trunk and dragged him to the edge of the water. Trevino and Tobar pushed the body into the water. Gonzales testified that Davalos was dead before he went into the water. Gonzales and Trevino disposed of the gloves they were wearing, and Trevino proceeded to wash away the blood from the bumper of the vehicle. Trevino, Gonzales, and Tobar got back into the vehicle and began to drive around for awhile before they drove back to Gonzales's house, where Trevino and Gonzales put the guns through the air-conditioning slot on the outside of Gonzales's window. Trevino and Gonzales returned to the car, Tobar was still inside, and they drove to a nearby ditch where Trevino crashed the car. The three exited the vehicle and lit the vehicle on fire with a cardboard box they had found in the back of the car. They then

8

walked for approximately forty-five minutes back to Gonzales's house.

Testifying similarly to Cervantes, Gonzales stated that the three of them went into the bathroom where Cervantes then found them. When asked about what happened, Gonzales said that Tobar told Cervantes that they had killed Davalos. Tobar appeared "serious" at the time, but Trevino "started laughing." After leaving Gonzales's house, Cervantes drove them all to the Wells Fargo ATM where Trevino and Tobar went to try and get money using Davalos's card. When everyone returned to the vehicle, Cervantes drove them back to Gonzales's house where they "smoked" and then Cervantes went back to his room to sleep and Gonzales, Trevino, and Tobar went to sleep as well. Gonzales testified that he woke up around 4:00 p.m. and Tobar and Trevino were putting the guns away in the "gun bag" Trevino had at Gonzales's house. The three of them took the guns and hid them in a grassy area behind Gonzales's uncle's house who lived on the same street. They then walked to "Mia's" house, who Gonzales identified as Trevino's girlfriend. According to Gonzales, Tobar kept Davalos's phone and stated that he intended to sell it. Later that evening, at his house, Gonzales and Trevino were arrested.

Gonzales admitted that he was not truthful in some of his statements to the police when he was arrested because he "didn't want to get in trouble." After he was certified to stand trial as an adult, Gonzales made an agreement to testify in exchange for a plea bargain which would sentence him to thirty years. He testified first in Trevino's trial.

On cross-examination, Gonzales admitted that Davalos's phone was discovered in his possession when he was arrested. He also confirmed that Trevino was the one "in charge" the night of the murder and that Tobar did not physically harm Davalos in any

way. While it was Gonzales's idea to scare Davalos, he did not plan for Davalos to be put into the trunk at gunpoint and shot. Gonzales was not aware that Tobar was going to be involved. Gonzales admitted that he did not call 911 or seek help when Trevino changed the plan because he was afraid of Trevino.

Gonzales admitted that Cervantes sold drugs to Davalos and provided drugs to Gonzales and Trevino. On the day of the murder, Gonzales had ingested drugs numerous times throughout the course of the day, admitting that he was high at the time of the murder. He also admitted that prior to the murder, he had been having illusions where he would "see demons."

Gonzales agreed that he had given different stories to law enforcement during his interviews. He also admitted to lying to the police and that he had reached the agreement for his testimony in Trevino's trial a "couple of days before Trevino's trial." He explained that he and Trevino discussed the plan to scare Davalos prior to Gonzales seeing Davalos that night and that Cervantes was aware that something was going to happen. He prepared for the attack on Davalos by taking latex gloves from work for himself and Trevino so that he did not get blood on his hands.

Gonzales admitted that he was the one who set the plan in motion to beat up Davalos, that he was upset that Davalos was telling others about their sexual relationship, and that Davalos had begun dating someone new. He admitted that he never tried to stop the course of action, even after Trevino put Davalos in the trunk and he saw that Trevino and Tobar had guns. At no point did he intervene or attempt to save or help Davalos.

Christopher King, an inmate in the Matagorda County Jail, testified that he and

Tobar "were in the same side in lock up" after Tobar was arrested for the murder of Davalos. King was not familiar with Tobar before they were in jail together. King also met Trevino while incarcerated and described him as "more aggressive." King and Tobar were both in the "F Pod," or solitary cell units, at the same time. The cells had bars, not solid doors, and this allowed the inmates to see out and hear around them. King explained that the inmates would often "send a line out" to communicate with each other, meaning they used a cut up sheet to send things down the line to each other, such as "a letter or a [bar of] soap." At some point during their incarceration, Tobar told King he was going to "send a line" and then sent a handwritten letter to King detailing his involvement in Davalos's murder. King testified that Tobar had sent him notes on "the line" three or four times. When King received the letters from Tobar, he stated that he put some thought into what to do, and eventually he got in contact with his lawyer and wrote to Crime Stoppers regarding the information Tobar had provided him.

On cross-examination, King confirmed that he had "cussed[ ] out" a guard to get pulled out of general population where he then apologized to the guard and explained that he had information on Trevino and Tobar that he wished to share to "help [his] situation." King admitted that over the next few days or more, he began a rapport with Tobar, talking during recreation times and while in their cells. He denied "groo[ming]" Tobar to give him information. He confirmed on re-direct that he was not asked by anyone in law enforcement or the State to coerce information out of Tobar, nor did he ever directly ask Tobar about the crimes he committed.

Sergeant Chris Haddish of the Bay City Police Department testified that he worked

with Ranger Chauvin to investigate the murder of Davalos. He was involved in interviewing witnesses, including Tobar's interview. Tobar requested a lawyer during his interview. The requested lawyer was unavailable, so they were unable to question Tobar immediately after his arrest. Although Tobar was not interrogated in his initial interview, he was being recorded while he was in the interview room. Sergeant Haddish testified as to Tobar's demeanor during this period of time and stated that Tobar appeared to be laughing to himself at various times. There were times on the video where Tobar, while alone, made statements to himself including "what the f--- man." Sergeant Haddish stated that Tobar appeared fairly "nonchalant throughout the process" after being charged with the murder of Davalos. On cross-examination, Sergeant Haddish admitted that he was not familiar with Tobar prior to this investigation and was unaware whether Tobar had a "nervous tick" that made him laugh when he was uncomfortable.

Donna Pruitt, a crime scene investigator with the Bay City Police Department, worked on the homicide case involving Davalos. She processed the evidence at the scenes and took crime scene photographs, which were admitted into evidence. Pruitt was also present for the search warrant on Gonzales's home. She testified that there was no DNA evidence linking Tobar to the murder.

Johnny Polk, a juvenile supervision officer at the Victoria Juvenile Detention Center, testified that he recalled Tobar being brought to the facility because it "was [his] first big charge." A recording of a phone call made by Tobar while in the detention center was admitted into evidence. The recording appears to capture Tobar telling someone "I'm [going] to kill someone else."

Steysy Rodriguez, a close friend of Tobar's, testified that she recognized Tobar's handwriting on the letter written to King. Rodriguez explained that she and Tobar had been very close friends prior to the murder and stayed in contact after Tobar was taken into custody. They talked on the phone and wrote letters to each other, which made her familiar with his handwriting. While Rodriguez admitted that she and Tobar had never exchanged letters prior to his incarceration and that Tobar did not sign his name to the letters, she identified his handwriting but stated that she could not be certain he wrote it.

DPS forensic document examiner Keelie Johnson testified that she performs "scientific origin, authenticity[,] and authorship" examinations of documents. Through her examination she can determine the writer of a document, as well as whether alterations have been made and the manner in which the document may have been produced. Johnson testified regarding the specific characteristics of handwriting that make it unique for examination, including connecting strokes, beginning strokes, baseline, slant, and handwriting style. Johnson compared known samples containing Tobar's signature against the letters sent to Rodriguez and turned over by King and using her analysis methods she came to the conclusion that "[t]here are indications that Micah Tobar may have written the question[ed] documents," which she explained means that there is evidence to suggest there was one writer of the documents in question. On cross-examination, Johnson confirmed that she could not say with certainty that Tobar wrote the letters in question, her conclusions indicated that he "may have" written them, but she explained that there were no indications that Tobar did not write the letters, or her conclusion would have been inconclusive. Over Tobar's objection, the letters were

13

admitted into evidence.

Tobar did not present any witnesses. The parties rested and closed. After closing, the trial court found Tobar guilty of all three charges: capital murder, aggravated robbery, and tampering with evidence. *See* TEX. PENAL CODE ANN. §§ 19.03(a)(2), 29.03, 37.09(c). After hearing witness testimony in the punishment phase, the trial court assessed punishment as described above. This appeal followed.

## II.    INSUFFICIENT EVIDENCE

Tobar argues that the evidence was insufficient to support a finding of guilt for the capital murder charge, "or any lesser included offense."[3]

## A.    Standard of Review & Applicable Law

We review the sufficiency of the evidence by considering "all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021); *see Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). The jury is the sole judge of witnesses' credibility and weight to be given the evidence presented, and we defer to those conclusions. *Hammack*, 622 S.W.3d at 914 (citing *Garcia v. State*, 367

---

[3] Though Tobar acknowledges the factual sufficiency review has been abolished by the Texas Court of Criminal Appeals, he nonetheless argues the evidence is factually insufficient to support his conviction. Tobar states that there is "a good faith basis to modify the existing law" to reinstate such a review and asks that this Court perform a factual sufficiency review. We are bound to follow the precedent of the court of criminal appeals and decline to perform a factual sufficiency review, as requested by Tobar. *See Page v. State*, 286 S.W.3d 377, 379 (Tex. App.—Corpus Christi–Edinburg 2008, pet. ref'd) ("Courts of appeals are intermediate appellate courts and, as such, are duty bound to apply the law as interpreted by the court of criminal appeals."); *see also* TEX. CONST. art. V, § 5(a) ("The Court of Criminal Appeals shall have final appellate jurisdiction coextensive with the limits of the state, and its determinations shall be final, in all criminal cases of whatever grade, with such exceptions and under such regulations as may be provided in this Constitution or as prescribed by law.").

S.W.3d 683, 687 (Tex. Crim. App. 2012)). We look to the "events occurring before, during[,] and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Id.* at 914–15. Not every fact or piece of evidence needs to point directly to appellant's guilt, so long as the cumulative force of all the evidence supports the convictions. *Id.* at 914. "Juries are permitted to draw reasonable inferences from the evidence presented at trial 'as long as each inference is supported by the evidence presented at trial.'" *Carter v. State*, 620 S.W.3d 147, 150 (Tex. Crim. App. 2021) (quoting *Hooper*, 214 S.W.3d at 15).

We measure the sufficiency by the elements of an offense as defined by a hypothetically correct jury charge. *Hammack*, 622 S.W.3d at 914. "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

A person commits murder if he intentionally or knowingly causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(a). As relevant here, a person commits capital murder if, *inter alia*, the person intentionally commits the murder in the course of committing or attempting to commit kidnapping. *Id.* § 19.03(a)(2). "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by

15

the conduct of another for which he is criminally responsible, or by both." *Id.* § 7.01(a). "A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2). "If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of carrying out the conspiracy." *Id.* § 7.02(b). "However, mere presence of a person at the scene of a crime, or even flight from the scene, without more, is insufficient to support a conviction as a party to the offense." *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012).

**B.    Analysis**

Tobar argues that there is no DNA or ballistic evidence linking him to the murder of Davalos. He states that Gonzales's own testimony was that Tobar was merely doing what Trevino told him to do. And further, that Tobar did not hit, shoot, or physically harm Davalos on the night of the murder. Tobar contends that "without the handwritten letter," which Tobar argues was inadmissible, there was "simply nothing to show that [ ] Tobar was criminally responsible." Even if this assertion was true, in a legal sufficiency review, "we consider all the evidence, admissible and inadmissible." *Johnson v. State*, 967 S.W.2d 410, 412 (Tex. Crim. App. 1998); *see Powell v. State*, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006). In accordance with this principle, we will consider the handwritten letter

in our review of the evidence. *See Powell*, 194 S.W.3d at 507; *Johnson*, 967 S.W.2d at 412; *see also Gomez v. State*, No. 13-23-00195-CR, 2024 WL 2066824, at *3 (Tex. App.—Corpus Christi–Edinburg May 9, 2024, no pet. h.).

Gonzales testified in great detail about the night of Davalos's murder. He testified that he, Trevino, and Tobar were all involved. Specifically, Gonzales explained that Tobar held Davalos at gunpoint and took his wallet and his phone from him before Trevino ordered Davalos into the trunk of the vehicle. While Gonzales explained that Tobar did not actually shoot Davalos, Tobar was involved in dumping Davalos's body in the river and in lighting Davalos's vehicle on fire when the three men abandoned it. Gonzales's testimony and Tobar's handwritten letter corroborate each other. *See* TEX. CODE CRIM. PROC. ANN. Art. 38.14 (stating that a defendant may not be convicted on the testimony of an accomplice unless that testimony is corroborated). In the letter, Tobar provides similar details of the murder, including admitting that he "point[ed] the strap" at the vehicle when Davalos and Gonzales arrived at Gonzales's home. Tobar's letter corroborates the sequence of events described by Gonzales during his testimony: they drove away with Davalos in the trunk; they stopped and Trevino shot Davalos; they kept driving and later shot Davalos again; and they ultimately found a river to dump his body. Tobar goes on to explain that they burned Davalos's vehicle and went back to Gonzales's cousin's house, complaining that "they" then "ruin[ed] everything by telling the whole story" to Gonzales's cousin.

Tobar, himself, did not need to be the shooter to be found guilty of capital murder.

If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of

17

the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

TEX. PENAL CODE ANN. § 7.02(b). In his letter, Tobar admits that Trevino called him to ask him to help "jump somebody." Trevino provided Tobar with a gun, a mask, and gloves and then told him the plan was to act like they were robbing Davalos and Gonzales. Tobar went along with the plan to "jump" Davalos and rob him. Even if he did not intend that the murder would occur, the offense was clearly committed in furtherance of the "unlawful purpose" for which he was part of, and it was reasonable to anticipate that a murder could occur in the course of carrying out the conspiracy. Viewing all the evidence in the light most favorable to the trial court's verdict, we conclude that the evidence is sufficient to support Tobar's conviction. *See Nelson v. State*, 405 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd); *Moreno Denoso v. State*, 156 S.W.3d 166, 173 (Tex. App.—Corpus Christi–Edinburg 2005, pet. ref'd) (concluding that the evidence was legally sufficient to support appellant's conviction for murder under a party theory of liability, where, among other things, appellant "was present during the murder, helped dispose of [the] body, concealed the car after the murder, and gathered with others at his house after the murder to continue drinking until the early morning hours"). We overrule Tobar's first issue.[4]

### III.   ADMISSION OF EVIDENCE

In his second issue, Tobar challenges the admission of the handwritten letter.

---

[4] On appeal, Tobar does not challenge his convictions for kidnapping or aggravated robbery.

18

Tobar argues that the letter was inadmissible because it was not properly authenticated.

## A.     Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Bowley v. State*, 310 S.W.3d 431, 434 (Tex. Crim. App. 2010). We will not reverse unless the record shows a clear abuse of discretion. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). A trial court abuses its discretion only when the court's decision was so clearly wrong as to lie outside the zone within which reasonable persons might disagree. *Id.*

## B.     Analysis

Texas Rule of Evidence 901 provides in part that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *Hislop v. State*, 64 S.W.3d 544, 545 (Tex. App.—Texarkana 2001, no pet.) (citing TEX. R. EVID. 901). Rule 901 contains an illustrative list of ways in which a document can be authenticated, including: nonexpert testimony about handwriting, comparison by an expert witness or the trier of fact, and distinctive characteristics and the like. *See id.* R. 901(b)(2), (3), (4).

The State presented a nonexpert witness, Rodriguez, who testified to Tobar's handwriting and her familiarity with it. Rodriguez explained that she and Tobar had exchanged numerous letters while he was incarcerated, and she recognized the handwriting on the confession letter to be his. The State also presented expert testimony which concluded that the handwriting analysis performed using the confession letter

19

compared to known samples of Tobar's handwriting indicated that Tobar "may have" been the author of the confession letter. The expert discussed the use of distinctive characteristics and traits in a person's handwriting and how Tobar could not be excluded as the author of the confession letter. While Tobar argued that the expert's analysis was not definitive and that Rodriguez could not be certain that the writing was Tobar's, there is no requirement that the proponent of evidence definitively prove its admissibility. *See White v. State*, 549 S.W.3d 146, 152 (Tex. Crim. App. 2018) (explaining that the admissibility of evidence is governed by the preponderance-of-the evidence standard). We conclude that the trial court had before it sufficient evidence to support a finding that Tobar wrote the letter. *See Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003); *Angleton v. State*, 971 S.W.2d 65, 67 (Tex. Crim. App. 1998). We find this combination of factors serves to provide an adequate level of authentication to meet the initial criteria of Rule 901 and provides the necessary condition precedent to admissibility. *See Hislop*, 64 S.W.3d at 546. We overrule Tobar's second issue.

## IV. CONCLUSION

The judgments of the trial court are affirmed.

NORA L. LONGORIA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
1st day of August, 2024.