Opinion issued April 8, 2025



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-23-00472-CR

———————————

**APOLINAR TEJEDA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 268th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 18-DCR-084953**

---

## MEMORANDUM OPINION

A jury convicted Apolinar Tejeda of murdering his wife, Rosa Liberato, and assessed punishment at confinement for life and a $10,000 fine. Tejeda challenges the judgment in five issues. We affirm.

## I.    Background

Liberato was murdered around twenty-five years ago in 1999. At the time, she worked at an Aramark facility in Stafford, Texas. On the morning of October 13, 1999, one of Liberato's co-workers parked next to Liberato's vehicle. She looked at Liberato's car and saw blood. After another employee arrived, they looked more closely at Liberato's car, where they saw Liberato in the driver's seat, slumped to the side. The other employee ran into the Aramark facility and alerted the manager. The manager looked out of his office window and saw Liberato in her car with "blood all over the place." The supervisor called 911. When the police arrived, they found Liberato dead from multiple gunshot wounds.

### A.    Events leading up to Liberato's murder

Prior to her death, Liberato was married to Tejeda. They had one child together, a son who went by the name "Junior" and was 14 years old at the time of Liberato's death. Liberato also had four other children, three daughters and a son, who were not Tejeda's children. Liberato's youngest daughter, Idania, described the relationship between Tejeda and Liberato as "somewhat volatile," with "[a] lot of breaking up." Liberato and Tejeda fought often, and Junior testified that he saw Tejeda choking Liberato about two years before her death. Another of Liberato's daughters testified that she witnessed Tejeda and Liberato get into physical fights on "many occasions." Liberato and her children moved to another residence "countless

2

times." But whenever Liberato would leave, Tejeda would "go look for her and then she would take him back."

Approximately two weeks before Liberato was killed, Tejeda was with Junior and his half-brother at a laundromat. Junior testified that while they were there, Tejeda told the boys, "I'm going to do something to your mother." Junior also testified that Tejeda said he suspected Liberato was having an affair.

In fact, both Tejeda and Liberato were involved in relationships with other people while they were married. These extramarital relationships led to frequent arguments, and about a month before she was killed, Liberato and Tejeda got into a "bad fight" about Tejeda's mistress. By October 1999, Liberato had decided she wanted to end her relationship with Tejeda, and she moved out of the apartment she shared with him and the children. Nonetheless, Liberato continued to return to the apartment most afternoons before Tejeda returned home from work, to cook for the children and get their clothes and lunches ready for the next day.

On October 11, 1999, two days before she was murdered, Liberato was at the apartment. She and Tejeda had dinner together. Idania, who was 18 years old at the time, was also there. Idania testified that during dinner, Liberato told Tejeda, "I don't care if you kill me, I'm not going to stay with you." Tejeda responded, "You know, I was just playing when I said that." Idania testified that Liberato seemed "afraid" when she left the apartment that evening. Liberato's immediate supervisor

3

at Aramark also testified that Liberato seemed "kind of scared and worrying" in the weeks prior to her death, and that Liberato "was afraid that [her husband] will do something to her."

The next day was a school day, and Junior typically woke for school around 7:00 a.m. But that day, Tejeda woke Junior early, at approximately 5:30 or 6:00 a.m., and asked if he wanted to go with Tejeda to speak with his mother. Junior declined, saying he had to go to school.

That evening, Liberato had gone to visit another of her daughters, Andrea. They talked about Liberato's relationship with Tejeda, and Andrea testified that Liberato appeared "afraid."

At Tejeda's apartment that evening, Tejeda told Junior he "was going to leave." Tejeda made similar statements to Idania, whom he asked to take care of Junior. That was the last time Junior and Idania spoke with or saw Tejeda in person until the trial of this case in 2023.

At approximately 2:30 a.m. on October 13, 1999, the day of Liberato's murder, Tejeda went to the apartment where his cousin, Ciriaco Palacios, lived with his wife Guadalupe Palacios and their family. Tejeda woke Ciriaco and Guadalupe by knocking on the front door. When Ciriaco answered, Tejeda asked to borrow his car. Ciriaco agreed without asking why. He handed Tejeda the keys and went back to sleep. Tejeda had never before asked to borrow his cousin's car.

4

Tejeda normally drove a uniquely painted truck with a "distinctive" appearance that "everybody recognized." Tejeda told Ciriaco he would leave his truck at Ciriaco's apartment, and said that if he hadn't returned by 6:00 a.m., when Ciriaco needed to leave for work, Ciriaco should take Tejeda's truck. Tejeda had not returned by 6:00 a.m., so Ciriaco drove Tejeda's truck to work that day. This interaction with Tejeda was the last time Ciriaco saw Tejeda or had any contact with him until the trial of this case in 2023.

Liberato's shift at Aramark started at 6:00 a.m. each day. The manager of the Aramark facility at which Liberato worked described her as "always . . . on time." On October 13, 1999, the manager arrived early to work and was there by around 5:30. He noticed a vehicle that was not normally there, with a person sitting inside it whom the manager described as "a smaller male" and "Hispanic." The manager thought it was "odd" that a car would be parked in that location with someone sitting inside it at that early hour.

The manager nonetheless went into his office inside the Aramark facility. After he had been there for 10 or 15 minutes, someone began pounding on the front door, saying a person's throat had been cut and he should call 911. The manager looked out his office window and saw Liberato in her car, covered in blood. He called 911, went outside, and noticed that the suspicious car he had seen before was gone.

5

When the police arrived, they found Liberato dead in her vehicle. The officer observed that Liberato was wearing "quite a bit of jewelry" and her purse was in her lap, such that he "didn't see anything to indicate it was a robbery." The driver's side window was down about four inches, with the other three windows rolled up. The officer also found bullets inside Liberato's vehicle and bullet casings near it, leading him to conclude Liberato had been shot at close range through the open driver's side window of her car.

An employee from a neighboring business testified he heard two gunshots in rapid succession at approximately 5:30 a.m. that morning, coming from the direction of the Aramark facility. A medical examiner later testified that Liberato died from homicide caused by two gunshot wounds to her left shoulder and neck.

Later that morning, Guadalupe learned that Liberato had been shot. Because Ciriaco had driven Tejeda's truck that day, Guadalupe called Ciriaco and "told him not to drive the truck because according to what I was told [Tejeda] had killed [Liberato]."

Ciriaco later learned his car (the one Tejeda borrowed) was left at his brother-in-law's house. Ciriaco testified he had owned the car for approximately nine months before Liberato's murder, that he was the only one who drove it, and that he had never had a gun in the car. Ciriaco gave the police permission to search his car, and they kept it for two or three days.

6

**B.    Law enforcement investigation of Liberato's murder**

The police swabbed Ciriaco's car for gunshot residue, taking samples from the front seats.  Over the defense's objection that the State had not established the police followed proper protocols in collecting the samples, the State's gunshot-residue expert testified that the front seats of Ciriaco's car had come in contact with a discharged firearm.  In addition, the State's firearms expert testified that the bullets and casings recovered from the scene of Liberato's murder were all fired from the same gun.  The gun used in Liberato's murder has never been recovered.

Three days after Liberato's murder, the police asked Ciriaco to bring his car to the Aramark facility where Liberato had worked.  They asked him to arrive during the early morning hours to stage the car near the Aramark facility at roughly the same time of day that the employee from the neighboring business had heard gunshots.  The manager of the Aramark facility where Liberato worked testified that Ciriaco's car was the car he had seen the morning of Liberato's murder, "no question."

Another witness who apparently had been near the Aramark facility the morning of the murder, Raul Galvan, also attended this staging of Ciriaco's car.  Galvan died before trial and thus was unavailable to testify.  As discussed in more detail below, Galvan apparently told a "Sergeant Crum" that Ciriaco's car was not

7

the one present the morning of the murder, but the State objected to Tejeda's attempt to present this evidence through Detective Linda Roman. The trial court sustained the objection.

## C. Tejeda's disappearance, arrest, and trial

None of the witnesses who testified at trial, including Tejeda's children and cousin, had any contact with Tejeda after Liberato's murder. Tejeda did not attend Liberato's funeral, and his son Junior testified that Tejeda was "around nowhere" after the murder. The police were likewise unable to locate Tejeda for several years, despite looking for him in California, North Carolina, and Mexico.

In September 2017, almost 18 years after Liberato's murder, a police officer in North Carolina pulled over a white van for a traffic violation. The driver of the van presented an identification card bearing Tejeda's photograph but with the name "Leopoldo Silva." After confirming there were no outstanding warrants for a person named "Leopoldo Silva," the officer let the driver leave with a warning. At trial, the officer identified Tejeda as the person he pulled over in 2017.

In August of 2018, police in Stafford, Texas received a tip that Tejeda was living in North Carolina under an assumed name. The Stafford police contacted law enforcement officers in North Carolina, who went to the address provided in the tip. They found Tejeda there and placed him under arrest. Tejeda was then extradited to Texas for trial.

8

The jury found Tejeda guilty of Liberato's murder. After a separate punishment trial, the jury assessed punishment at confinement for life and a $10,000 fine, and the trial court entered judgment on the jury's verdict.

## II. Analysis

Tejeda challenges his conviction in five issues. He contends the evidence was insufficient to convict him, and that the trial court erred by: failing to exclude extraneous-offense evidence; refusing his request to cross-examine police officers about inconsistent witness identifications of Ciriaco's car; allowing the State's gunshot-residue expert to testify that gunshot residue was found on the seats of Ciriaco's car without first establishing that proper protocols were followed in collecting samples from the car's front seats; and failing to exclude certain hearsay statements.

### A. There was sufficient evidence to support Tejeda's conviction

Tejeda's first issue challenges the sufficiency of the evidence supporting his conviction. He contends there was insufficient evidence to convict him because no eyewitness placed him at the scene of the crime, and because no physical evidence tied him to the crime scene.

#### 1. Standard of review

We review a challenge to the sufficiency of the evidence, regardless of whether denominated as a legal or factual sufficiency challenge, under the standard

9

of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018). When the trial court makes findings of fact, we determine whether the evidence, viewed in the light most favorable to the trial court's ruling, supports these fact findings. *See State v. Hardin*, 664 S.W.3d 867, 872 (Tex. Crim. App. 2022). "We review legal conclusions, such as the construction of a statute, *de novo*." *Id.*

Viewing the evidence in the light most favorable to the verdict requires that we consider all the evidence admitted at trial, including improperly admitted evidence. *See Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's credibility and weight determinations because the factfinder is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *See Winfrey*, 393 S.W.3d at 768. The *Jackson* standard is deferential and accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the facts. *See Jackson*, 443 U.S. at 319; *Zuniga*, 551 S.W.3d at 732.

We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *See Leroy v. State*, 512 S.W.3d 540, 543 (Tex. App.—Houston [1st Dist.] 2016, no pet.). Instead, we determine whether the necessary inferences are based on all the evidence presented at trial and viewed in the light most favorable to the verdict. *See Clement v. State*, 248 S.W.3d 791, 796 (Tex. App.—Fort Worth 2008, no pet.). Therefore, if the record supports conflicting inferences, we presume the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *See Jackson*, 443 U.S. at 326; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012).

We treat direct and circumstantial evidence equally under this standard. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *See Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper*, 214 S.W.3d at 13). Therefore, in evaluating the sufficiency of the evidence, we must consider the "cumulative force of all the evidence." *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017). Each fact need not point directly and independently to guilt if the cumulative force of all

incriminating circumstances is sufficient to support the conviction. *See Hooper*, 214 S.W.3d at 13.

**2.      The evidence was sufficient to support the jury's guilty verdict**

A person commits murder if he "intentionally or knowingly causes the death of an individual." TEX. PENAL CODE § 19.02(b)(1). Tejeda contends the evidence was insufficient to prove beyond a reasonable doubt that he murdered Liberato because "the State failed to establish any evidentiary connection, testimonial or physical, between the murder scene and appellant"—in other words, because the State's case was based on circumstantial evidence.

The State agrees its case was "essentially circumstantial." But "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13. Therefore, a "criminal conviction may be based upon circumstantial evidence," *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013), so long as the jury's determination of guilt is "warranted by the combined and cumulative force of all the incriminating circumstances." *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014). After reviewing the record in whole, we conclude this standard is satisfied here.

First, opportunity coupled with motive can be "indicative of guilt." *Nisbett v. State*, 552 S.W.3d 244, 265 (Tex. Crim. App. 2018) ("Opportunity, when coupled

with motive, is not sufficient to prove identity in a murder prosecution but is indicative of guilt."). Tejeda had a motive to kill Liberato in part because he was engaged in an extramarital affair, which upset Liberato and was the source of several arguments between them, including a "bad fight" about a month before Liberato's murder that led her to move out of the family home. In addition, Tejeda suspected Liberato was engaged in an extramarital affair, and shortly before she was killed, Liberato had decided she wanted to end her relationship with Tejeda. The jury heard testimony that the relationship between Tejeda and Liberato had been volatile for much of its existence, with multiple break-ups, Liberato moving out of the family home, and Tejeda physically attacking Liberato on several occasions.

Given the tumultuous history of the relationship—which appeared to be coming to a head with the affairs and Liberato's decision to end it—the jury could reasonably conclude Tejeda had a motive to kill Liberato. *See Nelson v. State*, 405 S.W.3d 113, 124 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (while extramarital affair, by itself, "is not enough to connect a person to his or her spouse's death," it "may provide a motive," such that where jury "heard testimony that appellant and the complainant were in an unhappy marriage and both wanted out," "[t]his evidence reveals that appellant had a motive for killing the complainant").

The jury also could have reasonably concluded that Tejeda had the opportunity to kill Liberato. There was testimony that Liberato arrived for work at

13

the same early hour each day, from which the jury could reasonably infer Tejeda would know when Liberato would be in the Aramark parking lot. There was testimony that a few hours before the murder, Tejeda made a middle-of-the-night visit to his cousin Ciriaco to borrow his car, leaving Ciriaco to drive Tejeda's "distinctive" truck that "everybody recognized." And Aramark's manager testified that he saw a man generally matching Tejeda's description in a parked car near the Aramark facility shortly before the murder, which he had "no question" was the same car Tejeda had borrowed from Ciriaco, and which was gone shortly after the murder. Therefore, the jury reasonably could have concluded that Tejeda had not only a motive but also the opportunity to kill Liberato. *See Merritt*, 368 S.W.3d at 526 (opportunity and motive are "circumstances indicative of guilt").

Second, the jury heard testimony from which it could reasonably infer Tejeda was planning to kill Liberato. For example, there was evidence Tejeda told Liberato he was going to kill her, and that he had told Junior and his brother he was "going to do something to your mother." Junior and Idania testified that Tejeda told them he would be leaving, and Idania testified that Tejeda had asked her to take care of Junior after he left. A reasonable jury could conclude from these statements, viewed in the context of the other evidence presented at trial, that Tejeda had made plans to kill Liberato and flee after he had done so. *See Metcalf v. State*, 597 S.W.3d 847,

14

855 (Tex. Crim. App. 2020) ("Juries can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial.").

Third, the State presented physical and testimonial evidence from which the jury reasonably could have inferred that Tejeda shot Liberato. Ciriaco's car tested positive for gunshot residue even though Ciriaco had never had a gun in the car at any time before Tejeda borrowed it. Ciriaco's car was parked at his brother-in-law's house after the murder, from which the jury could infer that Tejeda had abandoned the vehicle. There was also testimony that evidence at the murder scene was inconsistent with a robbery because Liberato's jewelry and purse had not been taken.

And finally, the jury heard testimony about Tejeda's flight after the murder. "Evidence of flight is . . . admissible as a circumstance from which an inference of guilt can be drawn." *Robinson v. State*, 236 S.W.3d 260, 267 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (citing *Burks v. State*, 876 S.W.2d 877, 903 (Tex. Crim. App. 1994)). There was evidence Tejeda left the state immediately following Liberato's murder, and that he had no further contact with his children or family until the trial of this case, over two decades later. And when he was found living out of state, Tejeda was using an assumed name. A reasonable jury could conclude from this evidence, coupled with the other evidence presented, that Tejeda left Texas because he had murdered Liberato and was seeking to avoid being held responsible. *See id*.

This evidence, taken as a whole and viewed in the light most favorable to the verdict, was sufficient to support a finding beyond a reasonable doubt that Tejeda murdered Liberato. *See Baltimore v. State*, 689 S.W.3d 331, 340 (Tex. Crim. App. 2024) (evidence is sufficient to support conviction where it will "justify a rational trier of the facts to find guilt beyond a reasonable doubt"). We overrule Tejeda's first issue.

**B.    The trial court did not abuse its discretion by admitting extraneous-offense evidence**

In his second issue, Tejeda contends the trial court committed reversible error by allowing testimony about his earlier physical attacks on Liberato. He argues this testimony was impermissible character-propensity evidence barred by Texas Rule of Evidence 404(b)(1), and that it was more prejudicial than probative and thus improper under Texas Rule of Evidence 403. We disagree.

Tejeda has waived any argument that the trial court improperly admitted testimony about his extraneous assaults on Liberato by failing to object each time such testimony was offered. The general rule is that admission of improper testimony is waived if testimony to the same effect has been permitted without objection. *Bryant v. State*, 340 S.W.3d 1, 12 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd); *see also Hudson v. State*, 675 S.W.2d 507, 511 (Tex. Crim. App. 1984) ("[A]n error in admission of evidence is cured where the same evidence comes in elsewhere without objection."). The two specific instances of extraneous-offense

16

testimony Tejeda complains about on appeal were presented without any objection, let alone the Rule 404 and Rule 403 objections argued on appeal. Without objection, Junior testified he witnessed Tejeda choke Liberato, and Andrea testified she had seen Tejeda "physically strike and kick" Liberato on "many occasions." Because Tejeda did not object to this testimony about his extraneous assaults on Liberato, he has waived any argument that the trial court improperly admitted such testimony elsewhere. *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) ("Our rule . . . is that overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.").

However, for the reasons explained below, even if Tejeda had not waived this argument, we would still conclude the trial court did not abuse its discretion by allowing testimony about Tejeda's prior physical assaults on Liberato.

### 1. Standard of review

We review a trial court's decision to admit extraneous-offense evidence under the abuse-of-discretion standard. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). A trial court's ruling to admit extraneous-offense evidence will be upheld if it is "within the zone of reasonable disagreement." *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018).

A trial court's ruling on extraneous-offense evidence is generally within the zone of reasonable disagreement "if the evidence shows that 1) an extraneous transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). We uphold an evidentiary ruling under any applicable theory of law, "even if the trial judge gave the wrong reason for his right ruling." *Id.* (citing *Sewell v. State*, 629 S.W.2d 42, 45 (Tex. Crim. App. 1982)).

## 2. Extraneous-offenses analysis

The propriety of the trial court's admission of testimony about Tejeda's prior assaults on Liberato is governed by several statutes and rules, all of which must be "applied congruously." *Garcia v. State*, 201 S.W.3d 695, 702 (Tex. Crim. App. 2006). The first is article 38.36(a) of the Texas Code of Criminal Procedure, which allows either party to admit evidence of the relationship between the victim and the defendant: "In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding . . . the previous relationship existing between the accused and the deceased[.]" TEX. CODE CRIM. PROC. art. 38.36(a).

However, article 38.36(a) does not "trump" the Texas Rules of Evidence; it must be read in conjunction with them, particularly (as relevant here) Rules 401,

18

403, and 404. *See Smith v. State*, 5 S.W.3d 673, 677–78 (Tex. Crim. App. 1999). Texas Rule of Evidence 401 requires that evidence be "relevant." TEX. R. EVID. 401. If extraneous-offense evidence is not relevant to a fact of consequence in the case, it may not be admitted. *See id.*

Extraneous-offense evidence also must be admissible under Rule 404(b). Rule 404(b) states that extraneous-offense evidence is generally not admissible "to prove the character of a person in order to show action in conformity therewith," but may "be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." TEX. R. EVID. 404(b)(1)–(2).

And finally, even if extraneous-offense evidence is admissible under these rules, it still may be excluded under Texas Rule of Evidence 403 if the probative value of the evidence is substantially outweighed by its unfairly prejudicial impact. TEX. R. EVID. 403.

Under these rules, the trial court did not abuse its discretion by admitting testimony about Tejeda's prior assaults on Liberato. First, this extraneous-offense evidence was admissible as a demonstration of "the previous relationship existing between the accused and the deceased." TEX. CODE CRIM. PROC. art. 38.36(a). The nature of Tejeda's relationship with Liberato was "clearly admissible under this

19

Article," and prior acts of violence between the victim and the accused may be offered to illustrate the nature of the relationship. *Garcia*, 201 S.W.3d at 702.

Next, the extraneous-offense evidence was relevant under Rule 401. Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." TEX. R. EVID. 401. Tejeda's identity as Liberato's murderer was the central issue at trial. The testimony from Junior and Andrea about Tejeda's prior attacks on Liberato had a tendency to make the State's position that Liberato was the murderer more probable, in part because "the extraneous acts of domestic violence contextualized the nature of the relationship" between Tejeda and Liberato. *Camacho v. State*, No. 01-20-00282-CR, 2021 WL 2832970, at \*7 (Tex. App.—Houston [1st Dist.] July 8, 2021, no pet.) (mem. op., not designated for publication). And in a murder case, the relationship between the victim and the accused is "itself a material issue." *Garcia*, 201 S.W.3d at 703. Therefore, the extraneous-offense evidence was relevant and admissible under Rule 401. *See Miller v. State*, No. 06-20-00015-CR, 2020 WL 4044717, at \*2 (Tex. App.—Texarkana July 20, 2020, no pet.) (mem. op., not designated for publication) ("Since evidence of prior assaults against the same victim bears on the nature of the relationship between the defendant and the victim, it is relevant evidence.").

20

The extraneous-offense evidence was also admissible under Texas Rule of Evidence 404(b). "Rule 404(b) is a rule of inclusion rather than exclusion." *De La Paz*, 279 S.W.3d at 343. Thus "if evidence (1) is introduced for a purpose other than character conformity; (2) has relevance to a fact of consequence in the case; and (3) remains free of any other constitutional or statutory prohibitions, it is admissible" under Rule 404(b). *Segundo v. State*, 270 S.W.3d 79, 88 n.19 (Tex. Crim. App. 2008) (citation and internal quotation marks omitted)). Whether extraneous-offense evidence has relevance apart from character conformity is a question for the trial court. *See Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

Again, Rule 404(b)(2) allows admission of extraneous-offense evidence "for another purpose, such as proving motive, opportunity, intent, [or] . . . identity[.]" TEX. R. EVID. 404(b)(2). Here, there were at least two such other purposes. The first was to show the nature of the relationship between Tejeda and Liberato. TEX. CODE CRIM. PROC. art. 38.36(a); *Camacho*, 2021 WL 2832970, at *7 (allowing evidence of extraneous instances of domestic violence because "[e]ach act of past violence provided the jury with an example of [the defendant's] controlling and aggressive behavior that had influenced the dynamics of their relationship over the years and provided insight into the path that led to the violence of the offense charged"); *Franco v. State*, No. 08-18-00040-CR, 2020 WL 3168560, at *8 (Tex. App.—El Paso June 15, 2020, no pet.) (mem. op., not designated for publication) (testimony

21

about extraneous acts of domestic violence admissible to show behavior that defined relationship between victim and defendant).

The other purpose was to show that Tejeda had both an intent and motive to kill Liberato. "Evidence of prior extraneous offenses committed by the accused against the victim of the offense charged that show ill will or hostility toward the victim 'is admissible as part of the State's case in chief as circumstantial evidence of the existence of a motive for committing the offense charged.'" *Page v. State*, 819 S.W.2d 883, 887 (Tex. App.—Houston [14th Dist.] 1991, pet. ref'd) (quoting *Foy v. State*, 593 S.W.2d 707, 709 (Tex. Crim. App. 1980)). Therefore, the testimony about Tejeda's extraneous assaults on Liberato was not impermissible character-conformity evidence, and instead demonstrated both the nature of the relationship between Tejeda and Liberato and Tejeda's motive and intent. Accordingly, the trial court would not have abused its discretion in concluding the testimony was admissible under Texas Rule of Evidence 404(b), had such an objection been made. *Bush v. State*, 958 S.W.2d 503, 506 (Tex. App.—Fort Worth 1997, no pet.) ("[P]rior instances of violence and threats between a defendant and a victim have been held admissible.").

And finally, the extraneous-offense evidence was admissible under Texas Rule of Evidence 403. Rule 403 permits the trial court to exclude otherwise relevant evidence if "its probative value is substantially outweighed by a danger of one or

more of the following:  unfair prejudice, confusing the issues, [or] misleading the jury . . . ." TEX. R. EVID. 403.  Tejeda argues this rule applies here because testimony about his prior assaults on Liberato "ask[ed] the jurors to surmise that an individual who is capable of domestic violence at a time prior in a romantic relationship is also guilty of murder," which "confuses the issues at stake" and "misleads the jury into reaching this determination."  He also contends the extraneous offenses were unfairly prejudicial because they were temporally remote from Liberato's murder.

Rule 403 "carries a presumption that relevant evidence will be more probative than prejudicial." *Martinez v. State*, 327 S.W.3d 727, 737 (Tex. Crim. App. 2010) (citation and internal quotation marks omitted)).  All evidence offered against a defendant is, by its nature, prejudicial. *See Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013).  Rule 403 does not exclude all prejudicial evidence; it focuses on "unfairly" prejudicial evidence. *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005).  Evidence is unfairly prejudicial if it would cause the factfinder to declare guilt on a ground other than proof specific to the offense charged. *Manning v. State*, 114 S.W.3d 922, 928 (Tex. Crim. App. 2003).

Trial courts have significant discretion in weighing probative value and unfair prejudice. *Powell v. State*, 189 S.W.3d 285, 288 (Tex. Crim. App. 2006).  When conducting the Rule 403 analysis, trial courts balance:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that

evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gonzalez v. State*, 544 S.W.3d 363, 372 (Tex. Crim. App. 2018) (quoting *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006)). However, "these factors may well blend together in practice." *Gigliobianco*, 210 S.W.3d at 642.

The Rule 403 balancing factors weigh in favor of admission of the testimony about Tejeda's prior attacks on Liberato. The probative force of this evidence is substantial because it showed the volatile nature of Tejeda's relationship with Liberato, which related to Tejeda's motive and intent. Both were important issues for the State to establish in this circumstantial-evidence case. *See Gonzalez*, 544 S.W.3d at 372; *Garcia*, 201 S.W.3d at 704.

There is little, if anything, that is unfairly prejudicial about the disputed evidence to counterbalance its probative force. Nothing in the record suggests the extraneous-offense evidence confused or distracted the jury from the main issues, led the jury to make its decision on an improper basis, or was given undue weight by the jury. *See Gigliobianco*, 210 S.W.3d at 641. And the disputed evidence did

24

not consume an inordinate amount of time or merely repeat evidence already admitted.

Nor were the extraneous offenses so remote in time as to make them unfairly prejudicial. Junior testified he saw Tejeda choking Liberato "about two years" before she was murdered, and Andrea testified she saw Tejeda attack Liberato throughout their relationship. Courts, including this one, have found substantially longer lapses did not preclude extraneous-offense evidence. *See, e.g.*, *Parlin v. State*, 591 S.W.3d 214, 224 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (noting that "courts have found that even long lapses in time do not deplete the probative value of the evidence" and collecting cases allowing evidence of extraneous offenses from 13 years, four to seven years, and 26 months before the charged offense).

Accordingly, we conclude the probative value of the evidence of Tejeda's prior attacks on Liberato was not substantially outweighed by any unfairly prejudicial effects, and thus it was admissible under Rule 403. We overrule Tejeda's second issue.

## C. The trial court did not abuse its discretion by refusing to allow the defense to cross-examine Detective Roman about Galvan's statements

Tejeda's third issue contends the trial court abused its discretion by refusing to allow the defense to cross-examine Detective Roman about Raul Galvan's statement that Ciriaco's car was not present the morning of the murder. When the police staged Ciriaco's car at the Aramark facility three days after the murder, the

manager of the facility identified Ciriaco's car as the same vehicle he had seen the morning of the murder, "no question" and "100 percent."

At trial, the defense attempted to ask about Galvan's statement during its cross-examination of Detective Roman.[1] The State objected on hearsay grounds, and the defense argued that Galvan's statement was admissible under the excited utterance and present sense impression exceptions to the rule against hearsay. *See* TEX. R. EVID. 802, 803(1)–(2). The State responded that Galvan's statement did not fall into either exception, noting that Galvan initially made the statement to Sergeant Crum, and thereafter gave a statement to Detective Roman, meaning Detective Roman should not be permitted to testify about Galvan's hearsay statement to Sergeant Crum even if it fell within an exception. No party called Sergeant Crum to testify at trial, although Detective Roman stated that "he's around." The trial court did not permit the defense to question Detective Roman about Galvan's statement,

---

[1] The record reflects that defense counsel asked Detective Roman, "And isn't it true that one of the witnesses said that that is not the car that . . . he saw," and that Detective Roman answered, "Correct," after the State objected. The State did not ask the trial court to instruct the jury to disregard this answer.

Moreover, even without this answer, the jury heard that two witnesses—the manager and Galvan—attended the car staging at the Aramark parking lot and that the manager identified the car as the one he saw on the morning of the murder. No evidence suggested that Galvan also identified the car as the one he saw on the morning of the murder, so we disagree with Tejeda's argument that his rights were substantially affected because a false impression was left with the jury.

26

telling defense counsel, "[w]e have to figure out another way, if we want that to come in."

On appeal, Tejeda claims this evidentiary ruling was an abuse of discretion. Although his brief does not contend Galvan's statement should have been admitted under the present-sense-impression and excited-utterance exceptions to the hearsay rule, Tejeda argues it "substantially and irrevocably affected [his] right by leaving a false impression before the jury that both witnesses identified Ciriaco Palacios' vehicle as being the vehicle present outside Aramark prior to the murder," and thus that "the trial court influenced the jury's verdict."

### 1. Standard of review

We review the trial court's evidentiary rulings for an abuse of discretion. *Schmidt v. State*, 612 S.W.3d 359, 369 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). A trial court abuses its discretion when it rules without regard for any guiding rules or principles. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). So long as the trial court's evidentiary ruling was at least within the "zone of reasonable disagreement," an appellate court may not disturb it. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990).

### 2. Cross-examination analysis

At trial, Tejeda argued he should be allowed to cross-examine Detective Roman about Galvan's statement because it comes within the present-sense-

impression and excited-utterance exceptions. We conclude that Galvan's statement does not fall within either of these exceptions.

A present-sense impression is "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." TEX. R. EVID. 803(1). "The rationale for the exception is that the contemporaneity of the statement with the event that it describes eliminates all danger of faulty memory and virtually all danger of insincerity." *Fischer v. State*, 252 S.W.3d 375, 380 (Tex. Crim. App. 2008).

The trial court could have reasonably determined that Galvan's statement to Detective Roman does not satisfy this exception. Per the arguments of counsel, during the staging Ciriaco's car at the scene for identification purposes, Galvan stated to a "Sergeant Crum" that Ciriaco's car was not the car he saw on the day of the murder. Detective Roman did not hear Galvan make this identification but took his statement after the identification had already been made. Accordingly, even assuming the present-sense-impression exception is applicable to Galvan's statement, the trial court properly concluded Detective Roman was "the wrong witness" through which to introduce the statement. *Id.* at 381 (present-sense-impression exception is "predicated on the notion that the utterance is a reflex product of immediate sensual impressions, unaided by retrospective mental processes" (citation and internal quotation marks omitted)).

28

Nor does Galvan's statement fall within the excited-utterance exception to the hearsay bar. An excited utterance is "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." TEX. R. EVID. 803(2). Here, the record contains no indication that Galvan was under the "stress of excitement" from "a startling event or condition" when he gave his statement to Sergeant Crum, and thus it does not qualify as an excited utterance. *See id*. Accordingly, we conclude the trial court did not err by refusing to allow the defense to cross-examine Detective Roman about Galvan's statement.

We overrule Tejeda's third issue.

## D. The trial court did not abuse its discretion by admitting testimony from the State's gunshot-residue expert

Tejeda's fourth issue challenges the reliability of testimony by the State's gunshot-residue expert, Crystina Vachon.

Detective Roman testified that, two days after Liberato's murder, she conferred with Detective Paul Germany about the possibility of gunshot residue left in Ciriaco's car. They obtained gunshot-residue-test kits from the police department and went together to Ciriaco's car, where Detective Roman observed Detective Germany swab the front seat to collect evidence for the testing. At trial, Detective Roman identified the gunshot-residue-test kits they used in 1999, recognizing Detective Germany's handwriting on the same. Tejeda's counsel did not cross-examine Detective Roman on whether any specific protocols or procedures applied

29

when swabbing for gunshot residue or whether Detective Germany did anything while swabbing the car that could have affected the reliability of the samples. Detective Germany died before trial, so Detective Roman's testimony was the only evidence of how the swabbing occurred.

The State later called Vachon, the gunshot-residue expert who analyzed the samples. Vachon described the type of test used in this case as being a vial with an orange plastic cap, and when the cap is removed, an aluminum disk with double-sided carbon tape is held to the underside of the cap by a post. The disk is dabbed on the surface to be tested, and then the cap is "placed back into the vial where the sample won't come in contact with anything else." Vachon stated that there were three kits taken in this case, and each kit contained four of the testing vials. She explained the samples collected from Ciriaco's car were originally tested in 1999, but she performed another analysis of the samples in 2023, approximately one month before trial. She said the samples had been "properly maintained," with no signs of "degradation or anything that concerned [her]"; that they remained "tape sealed," with "markings from the time of collection"; and that they looked the same as "a sample that would have been collected last week."

At that point in Vachon's testimony, Tejeda's counsel questioned her on voir dire, asking her what the general protocols were for sample collection. Vachon testified, "The general protocol is to remove the cap from the sampling device. Dab

it along any areas that you would like to sample. Close the sample back up and tape seal the kit that they're in. And keep that safe until testing is conducting." Vachon stated she was not there at the time the samples were taken. Tejeda's counsel objected to Vachon testifying further, but the trial court overruled the objection.

Vachon then testified that, based on her 2023 analysis, four of the 12 samples contained particles of gunshot residue, meaning the areas sampled "may have come in contact with a discharged firearm or [were] in proximity to a discharging firearm."

On cross-examination, Tejeda's attorney asked whether the person obtaining the sample is required to wear gloves, and Vachon answered, "It is recommended, but because you're not touching the surface of the sampling device, not wearing gloves should not affect the collection." Tejeda's attorney also cross-examined Vachon regarding other potential sources of the elements that signify possible gunshot residue and how any gunshot residue on the car seat may have been affected during the two days between the time of the murder and the sample collection.

On appeal, Tejeda claims the trial court erred by allowing Vachon's testimony, because the State offered no evidence about whether the proper procedures were used when the samples were collected, meaning Vachon's opinions were unreliable.

The trial court acts as a gatekeeper to determine the reliability, relevancy, and admissibility of scientific evidence. *Wells v. State*, 611 S.W.3d 396, 426 (Tex. Crim.

31

App. 2020) (citing *Vela v. State*, 209 S.W.3d 128, 136 (Tex. Crim. App. 2006)). An appellate court reviews a trial court's ruling in this context for an abuse of discretion. *Id*. at 427.

We conclude that the trial court did not abuse its discretion in admitting Vachon's testimony over Tejeda's objection that the State failed to establish the required protocol was followed in obtaining the samples to be tested. Vachon described the protocol as simply being removal of the cap from the vial, dabbing the underside of the cap on the area to be sampled, and placing the cap back onto the vial. Detective Roman testified she observed Detective Germany swab the front seat to collect evidence for the testing. While Detective Roman did not testify that Detective Germany was wearing gloves during the sampling, Vachon explained that wearing gloves was not required because the sample taker's hands do not touch the sampling surface. Accordingly, the trial court could have reasonably determined that the reliability of the samples was sufficiently established.

We overrule Tejeda's fourth issue.

E. **The trial court did not abuse its discretion in admitting Liberato's statements**

In his fifth and final issue, Tejeda contends the trial court abused its discretion by allowing Idania to testify that, two nights before Liberato was murdered, she heard Liberato tell Tejeda, "I don't care if you kill me, I'm not going to stay with you." Tejeda contends this statement should have been excluded as hearsay. Again,

we review the trial court's evidentiary rulings for an abuse of discretion. *Schmidt*, 612 S.W.3d at 369.

Hearsay is "a statement that: (1) the declarant does not make while testifying at the current hearing or trial; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." TEX. R. EVID. 801(d). It is generally not admissible unless an exception applies. TEX. R. EVID. 802.

Idania testified that she, Liberato, and Tejeda sat together for dinner, during which Liberato and Tejeda discussed their relationship, with Liberato still wanting to end the relationship. When asked whether Liberato said anything that indicated she was afraid, Tejeda's counsel objected to hearsay, and the State asserted that two hearsay exceptions applied: the present-sense-impression exception and the state-of-mind exception. *See* TEX. R. EVID. 803(1), (3). Tejeda's counsel responded that no timeframe had been established that would support these exceptions, but the State replied that the timeframe was the dinner table on October 11, 1999, during which time Liberato said something that made Idania believe Liberato was afraid. The trial court overruled the objection, and Idania testified that, while they were still at the dinner table, Liberato said "I don't care if you kill me, I'm not going to stay with you," to which Tejeda responded, "You know, I was just playing when I said that."

On appeal, Tejeda argues the statement does not fall within the present-sense-impression exception (he does not mention the state-of-mind exception) because

33

there was no evidence Liberato made the statement in immediate response to something Tejeda said. But the State did not offer Liberato's statement to prove that Tejeda had previously stated something, such as he was going to kill Liberato. In fact, Liberato's statement does not refer to anything Tejeda purportedly said. Instead, the statement was relevant to prove Liberato's then-existing state of mind regarding her intent, plan, and fear when explaining to Tejeda that she was leaving him no matter the consequences. *See* TEX. R. EVID. 803(3) (exception includes "statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)"); *Smith v. State*, No. 01-15-01055-CR, 2017 WL 929544, at *2 (Tex. App.—Houston [1st Dist.] Mar. 9, 2017, pet. ref'd) (mem. op., not designated for publication) ("A victim's statement that she intended to leave the defendant is admissible under the hearsay exception in Rule 803(3)."). We hold that the trial court acted within the zone of reasonable disagreement in allowing this statement under Rule 803(3).

We overrule Tejeda's fifth issue.

## III. Conclusion

We affirm the trial court's judgment.

Andrew Johnson
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.

Do not publish. TEX. R. APP. P. 47.2(b).